NO. 4-06-0849      Filed 3/1/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re:  VERONICA J., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Logan County |
| v. | ) | No. 04JA4 |
| JULIE YARBROUGH, | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Charles M. Feeney, |
| | ) | Judge Presiding. |

_____

JUSTICE APPLETON delivered the opinion of the court:

In May 2006, the State filed a petition to terminate the parental rights of respondent, Julie Yarbrough, as to her daughter, Veronica J. (born May 26, 2003).  Following an August 2006 hearing on the State's petition, the trial court found respondent unfit.  After a September 2006 best-interest hearing, the court found it would be in Veronica's best interest to terminate respondent's parental rights.  (The court also terminated the parental rights of Veronica's father, Chad J.; however, he is not a party in this appeal.)

On appeal, respondent argues (1) the trial court's findings of unfitness were against the manifest weight of the evidence and (2) the court erred in terminating her parental rights.  We affirm.

I. BACKGROUND

On February 4, 2004, the State filed a petition for

adjudication of wardship, alleging Veronica was dependent because she was without a parent, guardian, or legal custodian to care for her. Respondent mother was then a juvenile herself and was "in custody" in a separate case (Logan County case No. 02-J-11). Paternity had not been established, although Chad was named as Veronica's putative father. Chad's paternity was later established. The trial court entered a shelter-care order, finding an immediate and urgent need to remove the minor from respondent's home (it is unclear from the record where respondent and Veronica were living at the time).

On April 22, 2004, respondent, who was then 15 years old, admitted that Veronica was a dependent minor and agreed to continue the matter for one year under the supervision of the trial court pursuant to section 2-20 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-20 (West 2002)). The court entered an order continuing the matter under supervision for one year conditioned upon respondent's cooperation with the Illinois Department of Children and Family Services (DCFS) in this matter as well as in Logan County case No. 04-JA-2 (wherein respondent was the dependent minor). The supervision was also conditioned upon respondent attending school "each and every day, each and every class for the full class period." She was to use her best efforts to maintain passing grades in each and every class and any absence, tardiness, or truancy, not caused by

illness, would be deemed a violation of the court's order.

On May 20, 2004, the State filed a petition to revoke the continuance, alleging that on April 30, 2004, respondent "ran away from her foster home" and did not return until she was detained by the police on May 1, 2004. The petition also alleged respondent was "not using best efforts to maintain passing grades in each and every class at school."

On September 2, 2004, respondent admitted the allegations in the State's petition to revoke the continuance. On November 4, 2004, the trial court entered an adjudicatory order pursuant to section 2-4(1)(a) of the Juvenile Court Act, adjudicating Veronica dependent because she was without a parent, guardian, or legal custodian. The court based its finding on respondent's "age, unwillingness to comply with authority, foster placement, and prior detention." On the same day, the court entered a dispositional order, finding it was in Veronica's best interest that she be made a ward of the court and placed in the custody and guardianship of DCFS.

On May 2, 2006, the State filed a petition to terminate respondent's parental rights, alleging she was unfit because she had failed to (1) make reasonable efforts to correct the conditions that were the basis for the child's removal (750 ILCS 50/1(D)(m)(i) (West 2004)); (2) make reasonable progress toward the return of the child within the initial nine months following

- 3 -

adjudication (November 4, 2004 through August 4, 2005) (750 ILCS 50/1(D)(m)(ii) (West 2004)); and (3) protect the child from conditions within her environment that were injurious to the child's welfare (750 ILCS 50/1(D)(g) (West 2004)).

Testimony at the August 25, 2006, fitness hearing revealed the following. Upon removal, Veronica was placed by DCFS with her paternal grandmother, Rose Falcone. Chad and Rose's brother, Oscar, lived in the same house as well. On February 18, 2006, the Lincoln police department executed a drug-search warrant on Falcone's residence, naming Oscar as the primary target. When the police arrived at the residence, they found Chad, respondent, and Veronica asleep in a garage that had been converted into a bedroom. The police recovered approximately 14 pounds of marijuana, scales, smoking devices, and cash from the residence. The police found open beer bottles (some empty and some partially full) in the room where Chad, respondent, and Veronica were found.

In her interview with the police, respondent said she was residing at Falcone's house as well. (It is not clear from the record if DCFS approved of this living arrangement.) She knew Chad and Oscar sold drugs out of the house. She had seen Chad sell drugs from the same room in which she slept. Veronica was also present during those transactions.

Respondent testified that she turned 18 years old on

August 14, 2006, the week before the hearing. At the time of the hearing, she was living with her 19-year-old friend, Katy Day. She had been living with her for "a couple of weeks." Prior to living with Katy, respondent lived with another friend, Angie Cronin, for one month and with respondent's grandmother (name unknown) for "a few months" before that. She was working as a certified nursing assistant (CNA) at Maple Ridge Care Center, where she had been employed for one week. Prior to working at Maple Ridge, she had worked as a CNA at Kraus Retirement home for "a few days." She left Kraus in May 2006 to accept employment at Maple Ridge, but she did not start at Maple Ridge until August 2006. Between May and August, respondent was unemployed. As of the date of the hearing, she had not received a paycheck from Maple Ridge. She had not paid Angie, Katy, or her grandmother rent when she lived with each of them.

Respondent testified that she had been receiving $100 per month from DCFS but, because she had recently turned 18, she would not be receiving that support any longer. Her only means of support would come from employment. She had planned to obtain her own residence at an apartment complex that was being remodeled. At Maple Ridge, she earned $6.50 per hour and worked 40 hours per week.

Respondent stated that she chose to leave her grandmother's residence and live someplace else. She did not have

Veronica living with her at that time. If Veronica was with respondent, she would move back to her grandmother's.

Kelly Brooks, a DCFS caseworker, testified that she had been working with respondent in this case since 2004. In addition to Veronica's case, Brooks worked with respondent on her own dependency case, which was closed when respondent turned 18. Brooks also had an open case with respondent and Chad's four-month-old daughter, Carmen J. (born April 2006), who had also been adjudicated neglected and dependent.

The case plans in Veronica's case were dated March 21, 2005, August 22, 2005, February 6, 2006, and June 16, 2006. Brooks personally delivered each of those plans to respondent. One of respondent's tasks was to obtain suitable housing. Brooks said she was unaware that Oscar lived at Rose Falcone's house, and had she known, Veronica would not have been placed there. After the February 18, 2006, drug search, Veronica was placed in a traditional foster home, where she remained. Respondent had not maintained any permanent residence.

After February 2006, DCFS added the requirement to respondent's case plan that she remain drug- and alcohol-free, and respondent was referred for a drug and alcohol assessment. To date, respondent has not complied.

Brooks also testified that respondent had not maintained consistent employment since 2004. She was supposed to

obtain her general equivalency diploma (GED), but she has failed to do so. While she was pregnant (it is unknown to which pregnancy Brooks refers), DCFS placed her in the "homeward bound program." Respondent was dropped from the program for failing to comply.

Brooks further testified that respondent had been court-ordered to comply with a psychological evaluation. DCFS received approval for the evaluation in May 2006, but respondent had failed to cooperate and obtain one. As of April 2006, DCFS required that respondent attend a parenting course, but she had failed to comply. Respondent was also required to demonstrate responsible decision-making, which, according to Brooks, she had failed to do. For example, while respondent was a ward of the court, she failed to remain in her DCFS-assigned placement. Brooks opined that respondent's failure to complete her education and the drug and alcohol evaluation were also examples of respondent's poor decision-making. In addition, respondent had not followed through with visitation with Veronica. She had not visited Veronica between May 2006 and August 2006. Between February 2006 and April 2006, respondent frequently attended her weekly visitation. Respondent's visitation was sporadic in April and May and had been nonexistent since.

Brooks testified that she was the caseworker for respondent's juvenile case. In 2002, when respondent was 14

years old, DCFS filed a petition for adjudication of wardship based upon respondent's truancy issues. Respondent was involved in a relationship with Chad at the time. Pursuant to her case plan, respondent was required to complete her education. At the time, she had successfully completed eighth grade. Respondent had been placed in six or seven different foster placements, and, according to Brooks, respondent was lacking consistent support from anyone.

Brooks testified that, in May 2005 and November 2005, she considered respondent to have made reasonable efforts and progress toward the return of Veronica. After the execution of the search warrant in February 2006, DCFS added to respondent's tasks that she obtain an alcohol and drug evaluation, which she had not done. By the date of the hearing, respondent had successfully completed only the Constitution portion of the GED exam. Brooks said she did not find out until respondent's testimony that respondent was residing with Katy Day and that she had learned respondent previously resided with Angie Cronin by her subsequent investigation. The last of respondent's residences of which Brooks was aware was in June 2006 when respondent resided with her grandmother.

The trial court granted respondent's motion for directed verdict with regard to the State's allegation that respondent was unfit because she had failed to make reasonable progress

toward the return of the child within the initial nine-month period following adjudication (750 ILCS 50/1(D)(m)(ii) (West 2004)). Respondent presented no evidence.

After considering the evidence and arguments of counsel, the trial court found the State had proved, by clear and convincing evidence, that respondent had failed to make reasonable efforts to correct the conditions that were the basis for the child's removal (750 ILCS 50/1(D)(m)(i) (West 2004)) and had failed to protect the child from conditions in the environment injurious to her welfare (750 ILCS 50/1(D)(g) (West 2004)).

On September 14, 2006, the trial court conducted the best-interests hearing. The State called Chad, who testified he was still regularly consuming drugs and had not pursued treatment. He also stated he had not been in a relationship with respondent since July 2006.

Respondent testified that she last visited with Veronica in May 2006. After the fitness hearing, respondent called DCFS to schedule a visit with Veronica. The caseworker scheduled the visit for 8 a.m., the morning of the best-interest hearing. Respondent did not attend the visit because she was sleeping. She testified that she had returned home from work at 7 a.m. and gone to bed. She had planned to take the GED exam in a matter of days. She had contacted Community Action for assistance in obtaining housing. She stated that "in a couple of weeks" she

would be able to care for Veronica.

Brooks testified that respondent had failed to appear at scheduled visits with Veronica numerous times. Brooks also testified that Veronica's foster mother was willing to adopt her. (The State did not attempt to elicit this testimony from the foster mother.)

Jennifer K., Veronica's foster mother, testified that she had been Veronica's foster mother since February 2006. Also residing in Jennifer's home was Veronica's younger sister, Carmen, and Jennifer's adopted daughter, H.K. Jennifer had Carmen since she was two days old (April 2006). Jennifer stated that Veronica "was not at all potty trained" when she came into Jennifer's home but was "fully potty trained" in three months. Jennifer had to stop telling Veronica when visits with respondent were scheduled because respondent repeatedly failed to attend, which made Veronica very upset. After such events, Veronica would wet the bed and throw temper tantrums. She reverted to behavior that she had when she first came into placement.

Jennifer described a recent incident when a caseworker came to retrieve Carmen for a visit with respondent. Veronica said: "It doesn't matter. She won't show up anyways." Jennifer responded to Veronica: "She [(respondent)] called and said she would be there. And she's [(Carmen)] only going to be gone for an hour and you'll be at the babysitter's when she comes back."

- 10 -

According to Jennifer, Veronica replied, "She's not going to show up." Respondent had called to confirm but, in fact, did not appear.

At the close of the evidence, the trial court held that "[t]he lack of visitation since May [was] startling." "Such a simple little thing that could mean so much to a child." Now the "child has these memories of irresponsible, unreliable parents." The court indicated that it foresaw the benefit that the child would experience upon a termination of respondent's parental rights. According to the court, the case was "abundantly clear that the best interest of this child favors termination of each of these parent's [sic] rights." This appeal followed.

## II. ANALYSIS

### A. Unfitness

Respondent argues the trial court's findings of unfitness were against the manifest weight of the evidence. We disagree.

When proceeding on a petition to terminate parental rights under the Juvenile Court Act, the State must first demonstrate by clear and convincing evidence that the parent is "unfit" under one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2004)). Here, the trial court found respondent was unfit under the grounds set forth in sections 1(D)(m)(i) and 1(D)(g). As a reviewing court,

we accord great deference to the court's finding and will not disturb the finding on appeal unless it is against the manifest weight of the evidence. In re T.A., 359 Ill. App. 3d 953, 960, 835 N.E.2d 908, 913 (2005). Because each of the statutory grounds of unfitness is independent, the court's finding may be affirmed if the evidence supports the findings of unfitness on any one of the alleged statutory grounds. In re H.D., 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003).

## 1. Reasonable Efforts

At the time the State filed its petition to terminate respondent's parental rights (May 2006), section 1(D)(m)(i) defined unfitness as the "[f]ailure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent." 750 ILCS 50/1(D)(m)(i) (West 2004). For the purposes of determining a parent's fitness under this particular statutory ground, the trial court must focus on the parent's "reasonable efforts" during the initial nine-month period following the adjudication of neglect. In re D.F., 208 Ill. 2d 223, 239, 802 N.E.2d 800, 809 (2003). The "initial nine-month period" begins upon the entry of the court's order of adjudication. D.F., 208 Ill. 2d at 241-42, 802 N.E.2d at 811.

Here, the only relevant evidence for purposes of the unfitness finding under section 1(D)(m)(i) (750 ILCS

- 12 -

50/1(D)(m)(i) (West 2004)) is evidence of respondent's conduct during the period November 4, 2004, through August 4, 2005. The only evidence presented to the trial court concerning this time period was the following. Respondent was a dependent minor in the custody of DCFS, placed in a traditional foster home. Veronica resided with Rose Falcone, her paternal grandmother, and her father Chad. Respondent often and regularly visited Veronica. The original and primary issues with regard to Veronica's adjudication were respondent's failure to remain in foster placement and her failure to attend school.

The State failed to present any evidence regarding respondent's conduct during the applicable nine-month period. On the contrary, upon questioning by respondent's counsel, Brooks testified that during the applicable time frame, respondent had made reasonable efforts and reasonable progress. Throughout the fitness hearing, the State's evidence focused primarily on respondent's conduct since February 18, 2006, the date designated by DCFS as the date "when things started to fall apart."

When announcing its ruling in open court, the trial court set forth in detail the particular facts upon which it relied. As to the "reasonable efforts" ground, the court stated that it had relied on the facts that respondent had failed to attend school, remain in placement, comply with the ordered psychological evaluation, and maintain employment. Given the

particular time frame at issue, we find the court's reliance on certain facts misplaced.  The State failed to present sufficient evidence that respondent had failed to do any of those things during the initial nine-month period.  For example, the State did not present any evidence as to when respondent was enrolled and subsequently dropped from the "homeward bound" program.  The only evidence presented regarding respondent's education was that (1) she had successfully completed eighth grade, (2) she was enrolled in the "homeward bound" program, (3) she was dropped from the "homeward bound" program, and (4) she had completed the Constitution examination.  The record is silent as to when each of these events occurred.

The same can be said for the timing and duration of respondent's residential placements.  The evidence indicated only that respondent was placed in several foster homes, lived at Falcone's house as of February 18, 2006, and, at some point, resided with her grandmother.  Beyond that, the evidence did not support the court's finding that respondent failed to remain in placement between November 4, 2004, and August 4, 2005.

Further, the evidence did not provide sufficient details of respondent's employment history (as it pertained to the nine-month time frame) to justify the finding that she had failed to make reasonable efforts in resolving the dependency issue due to her lack of employment stability.  The only evidence

- 14 -

relating to respondent's employment history concerned her CNA positions beginning in May 2006.

Finally, Brooks testified that respondent was ordered to submit to a psychological evaluation only "eight or nine months" prior to the fitness hearing. For obvious reasons, respondent's failure to comply with that evaluation had no bearing on her reasonable efforts during the applicable nine-month evaluation period. Without clear and convincing evidence that respondent had failed to make reasonable efforts as evidenced by her conduct between November 4, 2004, through August 4, 2005, the trial court's finding of unfitness on that ground was manifestly erroneous.

### 2. Injurious Environment

The trial court also found respondent was unfit pursuant to section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2004)), which provides that a parent is unfit due to his or her "[f]ailure to protect the child from conditions within his environment injurious to the child's welfare." The court relied on evidence "much broader" than that of the February 18, 2006, raid at Falcone's residence. In particular, the court emphasized the fact that respondent was aware drugs had been sold from the residence at a time when she and Veronica were present. Respondent had witnessed Chad engage in drug sales 10 times from the same room in which she and Veronica were found sleeping. She had

also witnessed Oscar sell drugs an additional 5 to 10 times from the residence.

Although it minimized the significance of its finding, the trial court also mentioned the fact that the police had found open beer bottles in the room where Veronica had been sleeping. The court placed great significance on the risk of harm associated with drug sales in the presence of a minor and noted the inherent danger in conducting such activity, speculating as to the possibility of an armed robbery or "any other kind of bad activity that occurs when you're dealing drugs." Based upon the evidence, the court found the State had proved by clear and convincing evidence, that respondent was unfit for failing to protect Veronica from dangerous environmental conditions.

As a matter of law, a parent may not be found unfit under section 1(D)(g) during a time after the child was removed from the parent's custody. See In re C.W., 199 Ill. 2d 198, 212, 766 N.E.2d 1105, 1114 (2002). However, this principle of law presumes that, once the child has been removed from the parent, he or she has been placed in foster care separate and apart from the parent's environment. See C.W., 199 Ill. 2d at 212, 766 N.E.2d at 1114. "Logic dictates that once the child is removed from the injurious environment, there can be no further failure to protect." C.W., 199 Ill. 2d at 215, 766 N.E.2d at 1115.

In the case sub judice, the basis for the trial court's

finding of unfitness under the failure-to-protect ground (the February 18, 2006, raid and the realization that respondent knew drugs were sold out of the residence) occurred _after_ the child had been removed from respondent's care. That fact makes this case distinguishable from the traditional principle set forth above. Although Veronica had been legally removed from respondent's care, she was placed in relative placement--the same physical residence in which respondent resided at the time. Thus, respondent had the opportunity, yet failed to, protect Veronica by allowing her to reside in a home where drug sales often occurred.

There exists no requirement under section 1(D)(g) that a respondent be permitted a period of time to correct or improve an injurious environment before she may be found unfit on this ground. In re B.R., 282 Ill. App. 3d 665, 670, 669 N.E.2d 347, 351 (1996). Thus, a parent's actions before the child was removed may serve as a basis for terminating his or her parental rights without forewarning. This makes respondent's case more egregious. Veronica had already been removed from respondent's custody, and respondent had already admitted Veronica was dependent. Respondent was aware that she had certain tasks to perform and that she had to abide by a certain standard of conduct in order to regain the privilege of caring for her daughter. In this vein, respondent ultimately failed. On the record evidence,

we find the trial court's finding that respondent was unfit for failing to protect Veronica from an environment injurious to her welfare pursuant to section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2004)) was not against the manifest weight of the evidence.

### B. Best Interest

Respondent argues the trial court's decision terminating her parental rights was against the manifest weight of the evidence. We disagree.

Courts will not lightly terminate parental rights because of the fundamental importance inherent in those rights. In re M.H., 196 Ill. 2d 356, 362-63, 751 N.E.2d 1134, 1140 (2001). Once the trial court finds the parent unfit, the parent's rights are no longer of concern. The parent's rights must yield to the best interest of the child. In re Tashika F., 333 Ill. App. 3d 165, 170, 775 N.E.2d 304, 307 (2002). The court's best-interest finding will not be reversed unless it is against the manifest weight of the evidence. H.D., 343 Ill. App. 3d at 494, 797 N.E.2d at 1121.

The best-interest report indicated Veronica had been placed in a traditional foster home as of February 2006. Her younger sister, Carmen, was placed in the same home upon her birth in April 2006. Since being in the home, Veronica had become potty-trained, stopped cursing, and developed healthy

- 18 -

eating habits. According to the report, when Veronica first arrived in the home, she frequently used unacceptable language and refused to eat anything but hotdogs and snack foods. The report found Veronica was thriving in her new home, as she had a very consistent schedule for bedtime, nap time, and meal times. Her needs of emotional and physical stability were being met. She seemed very attached to her foster mother and her foster mother's adopted daughter and enjoyed placement with Carmen. The report recommended respondent's parental rights be terminated.

The evidence presented at the best-interest hearing indicated that Veronica's placement was an adoptive home. The evidence further indicated that Veronica, who was three years old at the time, emotionally suffered from respondent's failure to appear at her scheduled visitation times. Respondent testified that she had not visited with Veronica since May 2006. Prior to that time, she regularly visited Veronica. After May, Veronica would anticipate the visits only to be repeatedly disappointed when her mother failed to attend. Jennifer K. testified that for a day or two after the unsuccessful visit, Veronica would act in an atypical manner, via temper tantrums or bed-wetting. Veronica also made comments when Carmen was scheduled to visit respondent regarding respondent's likelihood of failing to appear.

We find it is in Veronica's best interest to allow her to obtain the permanency, stability, and support she deserves and

requires.  Based on the evidence presented, we find the trial court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

COOK, J., concurs.

STEIGMANN, P.J., specially concurs.

PRESIDING JUSTICE STEIGMANN, specially concurring:

Although I agree with the result, I disagree with some of the majority's analysis in reaching that result.  Accordingly, I specially concur.

The majority discusses at some length the sufficiency of the State's evidence during a given nine-month period, as required by section 1(D)(m)(i) of the Adoption Act.  However, respondent mother, in appealing the trial court's judgment terminating her parental rights, has not raised any issue concerning the sufficiency of the State's evidence during any nine-month period.

Because the majority addresses this issue <u>sua</u> <u>sponte</u>, we do not know what response, if any, the State might have provided if respondent mother had raised the issue in her brief. It is at least possible that the State's response might have caused the majority to modify its discussion or, perhaps, to eliminate it entirely.

Although this court is otherwise affirming, the majority nonetheless deems the State's evidence insufficient (in part) and declares that one aspect of the trial court's finding of unfitness was "manifestly erroneously." I conclude it is neither fair to either the State or the trial court nor appropriate for the majority to reach these conclusions <u>sua</u> <u>sponte</u>. Indeed, the first time that the State or the trial court will know that this issue even exists is when they receive a copy of this opinion.