NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190367-U

NO. 4-19-0367

FILED
November 6, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* Z.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 17JA197 |
| v. | ) | |
| Gregory S., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's findings respondent was unfit under section 1(D)(m)(ii) of the Adoption Act and it was in the minor's best interests to terminate respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    Respondent, Gregory S., appeals from the trial court's judgment terminating his parental rights to his minor child, Z.S. Respondent claims the court's associated orders finding him to be an unfit parent and finding termination to be in Z.S.'s best interests were against the manifest weight of the evidence. We affirm.

¶ 3                            I. BACKGROUND

¶ 4    In September 2017, the State filed a three-count petition, alleging Z.S., born April 4, 2016, was a neglected and abused minor. The State alleged respondent's wife, R.S. (also the minor's mother), who is not a party to this appeal, exposed the minor to substance abuse (counts I and II) and the substantial risk of physical harm (count III), thereby not providing the necessary

care for the minor's well-being, which created an environment injurious to the minor's welfare and a substantial risk of physical injury to the minor by other than accidental means. See 705 ILCS 405/2-3(1)(a), (1)(b), (2)(ii) (West 2016). The State named respondent in each count, alleging he was aware of the issues and was protective of the mother, not the child.

¶ 5　　　　The Illinois Department of Children and Family Services (DCFS) opened an intact family case in April 2016 due to R.S.'s alcohol abuse. R.S. had taken Z.S. to a babysitter and stated she would return soon. She returned much later in a highly intoxicated state. R.S. completed treatment in June 2016 but relapsed soon after. By September 2017, DCFS was prepared to close the intact case when workers visited the family's home to discuss such closure. Respondent answered the door and tried to shield the workers from seeing R.S. in her then highly intoxicated state, to no avail. R.S. was attempting to interact with and care for Z.S. as the workers intervened. According to the shelter-care report, respondent "did not move from the chair as the struggle continued between [R.S.], [Z.S.], and youth advocate workers[.] [Respondent] did not take steps to ensure [Z.S.]'s safety and protection." The workers took R.S. to the hospital for detoxification. The minor's paternal grandmother took custody of the child. The intact case became a placement case due to R.S.'s relapse and respondent's inability to protect the minor.

¶ 6　　　　On October 26, 2017, the trial court found, based on the parents' stipulation, that Z.S. was a neglected minor who suffered from a lack of support and care (705 ILCS 405/2-3(1)(a) (West 2016)) by both parents. On November 16, 2017, after the dispositional hearing, the court entered a dispositional order making Z.S. a ward of the court.

¶ 7　　　　On February 28, 2019, the State filed a motion to terminate R.S.'s and respondent's parental rights, alleging they were unfit parents. The allegations against respondent were as follows: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the

minor's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from respondent during any nine-month period following adjudication (750 ILCS 50/1(D)(m)(i) (West 2018)); (3) failure to make reasonable progress toward the return of the minor during any nine-month period following adjudication, namely October 27, 2017, to July 27, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)); and (4) failure to make reasonable progress toward the return of the minor during any nine-month period following adjudication, namely May 27, 2018, to February 27, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 8        On April 12, 2019, the parties convened for a fitness hearing. At the beginning of the hearing, R.S. surrendered her parental rights. Sandy Dunn testified that she had been the court-appointed special advocate (CASA) for Z.S. since April 2016, the start of the intact case. She said the overriding problems in the case are R.S.'s "insobriety" and respondent's inability to keep R.S. away from Z.S. Respondent got his own apartment in August 2018 and moved away from R.S. with the hope of "get[ting] his daughter back into his care and away from [R.S.]." However, respondent has been unable to completely refrain from seeing R.S., as she has become pregnant two times since the caseworkers recommended they separate. When asked why he was unable to separate from her, he stated he felt she needed support. In Dunn's opinion, respondent would never be able to completely separate from R.S. Respondent's lawyer, the caseworker, and Dunn have all told respondent that his only hope of getting custody of Z.S. would be to completely separate himself from R.S. Dunn said: "I don't know if he could be strong enough to keep [R.S.] out of *** the picture."

¶ 9        On cross-examination, Dunn acknowledged that respondent had complied with services, completed a mental-health assessment without recommendations, completed a parenting

course, and regularly attended Al-Anon meetings. Although Dunn had not personally seen respondent and R.S. together, they both had acknowledged they spoke often, attended church together, and were having another child together. Dunn said respondent was very protective of R.S. and tried to keep her safe and well. He missed visits with Z.S. due to R.S.'s intoxication.

¶ 10 Robert Bambuch, an adoption case manager at Webster-Cantrell Hall, testified he was not involved in the case but he knew the parties from visits to the agency. He said he saw respondent and R.S. at Walmart in October 2018. He said it "looked like they were together as a couple."

¶ 11 Summer Holley, a child-welfare specialist at Webster-Cantrell Hall, testified she had been the caseworker since July 2018. At that time, the agency believed a return home of the child to both parents was not going to work because respondent was "doing services" and R.S. was not. The workers met with respondent and advised that he could "do this" independently and work toward a return of Z.S. to him. However, they warned him that if he wanted to stay with R.S., it "could be a problem because she's not addressing what she needs to address. And there is no, that is a huge safety concern." Holley said, from what she had observed since July 2018, respondent did not choose the "independent route." She explained:

> "I can, at that last ACR [on August 27, 2018,] and the ACR before that with Rob Schiffman, he was also told in that ACR this is—we're at a critical point. Like, you can't, you are either going to choose [R.S.] or you are going to choose [Z.S.] but the two of them together aren't going to work. So, he was aware of that. He's, there was a meeting we had, sorry, here at the courthouse with attorneys, CASA, the CASA supervisor, myself, my supervisor, and [R.S.] was pregnant the first time in that meeting. And we just asked about it and he said, yeah, it's his child. He took

responsibility for that so we knew they had been together still and then she miscarried and got pregnant again, and again, [respondent] said he was the father."

¶ 12 Holley said it was made clear to respondent more than once (later in her testimony she clarified they spoke about it "at least ten times") that he could not be around R.S. and be protective of Z.S. at the same time. He needed to pick one or the other. She said the agency came to this conclusion because R.S. had appeared at the agency numerous times intoxicated. To Holley, respondent's choice was clear. She said:

"I think he has good interaction with [Z.S.] when he gets his visits. But those are supervised and that he's still with [R.S.] and he's admitting he's still with [R.S.] and [R.S.]'s still using and that is a completely unsafe situation, that is a huge concern."

¶ 13 Holley said she does not believe respondent has made any kind of progress toward the return of the minor. He has many times indicated he wanted to proceed independently but he has continuously conducted himself to the contrary.

¶ 14 On cross-examination, Holley testified that the workers talked about increasing respondent's visitation schedule but then the goal was changed to substitute care pending termination of parental rights. She said had the goal not been changed, the workers possibly would have been amenable to increasing respondent's visits without R.S. present.

¶ 15 On redirect, Holley testified that, after respondent obtained his own apartment, he continued to stay with R.S. She said respondent was spotted at R.S.'s residence "numerous times." The State rested and no other party presented evidence.

¶ 16 After considering the evidence and counsels' closing statements, the trial court found the State had sufficiently proved respondent to be an unfit parent on the grounds set forth in

the State's petition. The court found it "very significant" that, although respondent followed the requirements of his service plan, he "sadly" could not separate himself from R.S. after numerous conversations about such requirement as a prerequisite for obtaining custody of Z.S. And, the court noted, the caseworker testified she did not believe respondent would be able to do so within the next six months. The court found respondent's behavior resulted in no change despite the numerous conversations setting forth the requirements.

¶ 17        On June 10, 2019, the trial court conducted the best-interest hearing. The State called Amanda Beasley-Ricks as its first witness. She testified as the director of foster care at Webster-Cantrell Hall, the supervisor of the case, and author of the best-interest report. She testified that Z.S. had been placed with her paternal grandmother since September 7, 2017. She said Z.S. "does very well," is "very attached," and is "very bonded" with her grandmother. Based on Beasley-Ricks's observation, Z.S. feels love, attachment, and a sense of value with her grandmother. She said Z.S. is in a potential adoptive placement and is receiving all her necessary care in this placement. Beasley-Ricks noted no concerns about unauthorized or unsupervised visits between Z.S. and respondent or R.S. because her grandmother had always followed the agency's guidelines to not jeopardize Z.S.'s placement. In Beasley-Ricks's opinion, it would be in Z.S.'s best interests in terms of her stability, consistency, security, and safety, that respondent's parental rights be terminated. Beasley-Ricks stated:

> "My concern is throughout this case—we've had several meetings with
> [respondent], and my current concern is his ability to keep [Z.S.] safe due to the
> issues of [R.S.]'s substance abuse, and that has been an ongoing issue throughout
> this case, and they continue to remain married, they continue to be together, which

that's fine. However, looking at the well-being of the child our agency wants to make sure that safety net is there, and at this time, I do have a concern with that." To her knowledge, respondent remained with R.S.

¶ 18 On cross-examination, Beasley-Ricks stated she had observed respondent and Z.S. together and that respondent "does very well" with her. She had no doubt that respondent could provide for Z.S.'s basic needs. However, she said, respondent chose to remain with R.S. rather than to regain custody of Z.S. The State rested.

¶ 19 The trial court noted it would consider Beasley-Ricks's best-interest report. The report noted respondent's progress "continues to rate unsatisfactory." Although respondent indicated he would move forward in the case independently, he continued to remain with R.S. knowing "the main issue," *i.e.*, her substance abuse, was "not being addressed." Further, Z.S. was in a stable environment where she was protected "in any situation." Z.S. and her paternal grandmother/foster mother shared a strong bond and a very close relationship. Z.S. was in a home where all her needs were met and where she could achieve permanency through adoption. Beasley-Ricks recommended the termination of respondent's parental rights.

¶ 20 The parties presented no further evidence. After considering the evidence, the best-interest reports, the arguments of counsel, and the statutory best-interest factors, the trial court found the State sufficiently proved it was in the minor's best interest to terminate respondent's parental rights.

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 On appeal, respondent argues the trial court's determinations that he was an unfit parent pursuant to sections 50/1(D)(b), (D)(m)(i), and (D)(m)(ii) of the Adoption Act (750 ILCS

50/1(D)(b), (D)(m)(i), and (D)(m)(ii) (West 2018)) and it was in Z.S.'s best interests to terminate his parental rights were against the manifest weight of the evidence. We disagree and affirm.

¶ 24                                      A. Finding of Unfitness

¶ 25          Respondent argues the trial court erred when it found he failed to make reasonable progress during either alleged nine-month period when the evidence showed he moved out of R.S.'s residence, obtained his own apartment, and completed all of his services. The State argued respondent failed to make reasonable progress by demonstrating his inability to protect Z.S. from R.S.'s substance abuse. That argument, and likewise, the court's judgment, he contends, was based on mere speculation. Respondent claims the State had no proof he would not be able to protect Z.S.

¶ 26          The termination of parental rights is a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002); 705 ILCS 405/2-29(2) (West 2018). The trial court must first find a parent is unfit as defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2018). Section 1(D) lists several grounds upon which a finding of unfitness can be made. 750 ILCS 50/1(D) (West 2018). Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit if he fails to make reasonable progress toward the return of the child within any nine-month period after an adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018). The statute also provides:

> "[i]f a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child

- 8 -

into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987." (Emphasis added.) 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 27 The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship and, as such, the State must prove parental unfitness by clear and convincing evidence. 705 ILCS 405/2-29(4) (West 2018); *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The trial court's decision should not be reversed on appeal unless the finding was against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208. Only if the record shows it is clearly apparent the court should have reached the opposite conclusion will the court's decision be deemed to be against the manifest weight of the evidence. *Id.* The court is to consider evidence occurring only during the relevant nine-month period to determine whether a parent has made reasonable progress toward the return of the minor. *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 28 In this case, the trial court found respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress during the nine-month period between May 27, 2018, and February 27, 2019. See 750 ILCS 50/1(D)(m)(ii) (West 2018). Our supreme court has interpreted section 1(D)(m)(ii) as requiring a parent make demonstrable movement toward the goal of reunification. *C.N.*, 196 Ill. 2d at 211. The benchmark for measuring a parent's reasonable progress under section 1(D)(m)(ii) of the Adoption Act includes compliance with service plans *and court directives* in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent. *Id.* at 216-17. Reasonable progress exists when the court can conclude the progress being made by a parent to comply with the directives given for the return of the minor is sufficiently demonstrable and of such quality that the court

would be able to order the child returned to the parent's custody in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22. The standard regarding whether a parent has made reasonable progress toward unification is an objective one, and at a minimum, a finding a parent has made reasonable progress requires there was some movement toward the goal of reunification with the child. *In re B.W.*, 309 Ill. App. 3d 493, 499 (1999).

¶ 29        Service plans are an integral part of the statutory scheme, and compliance with the service plans is intimately tied to a parent's progress toward the return of the child. *C.N.*, 196 Ill. 2d at 217. The failure to make reasonable progress includes the failure to substantially fulfill the terms of the service plans. *Id.* at 216-17.

¶ 30        Although respondent completed the services in his plan, he nevertheless failed to make progress toward the child's return to his custody. He disregarded the court's directive to separate himself from R.S. for the protection of the minor. The primary reason for the minor's removal from respondent's custody was R.S.'s ongoing and untreated substance abuse. Respondent was advised many times that in order to regain custody of Z.S., he would need to separate from R.S. Obtaining his own apartment was apparently merely a formality. In fact, the evidence demonstrated that twice R.S. became pregnant with respondent's child during the case. That is, R.S. was carrying respondent's child at the time of the fitness hearing.

¶ 31        Respondent was aware of R.S.'s substance abuse and the possible harm such ongoing intoxication could bring to Z.S. He not only refused to separate himself from R.S. in the interest of Z.S.'s safety and welfare, but his disregard, apparent apathy, and oblivion for the child's safety and welfare was manifested by the fact that he will soon father another child with R.S.

¶ 32        A stated purpose of the Juvenile Court Act of 1987 is to "secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety

and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents *only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal \*\*\**." (Emphasis added.) 705 ILCS 405/1-2(1) (West 2018). The State and the trial court are bound to act in furtherance of this purpose. *In re J.J.*, 142 Ill. 2d 1, 8 (1991).

¶ 33 Here, the State believed that, notwithstanding any compliance by respondent with the service plans, he had failed to correct conditions in the home following removal of the minor by demonstrating an inability to separate himself (and presumably Z.S.) from R.S.'s ongoing substance abuse. "The State was not required to disregard respondent's initial and substantial failing as a parent merely because [he] participated in offered services." See *C.W.*, 199 Ill. 2d at 220. Respondent was given two options: either he remain with R.S. and lose custody of Z.S. or, he proceed independently, separating himself from R.S., and work toward regaining custody of Z.S. Although he advised he would proceed independently, he failed to make reasonable progress in that regard and demonstrated no indication to do otherwise.

¶ 34 We conclude the trial court's finding of unfitness on reasonable-progress grounds was not against the manifest weight of the evidence and therefore, we need not address the remaining alleged grounds. See *In re M.I.*, 2016 IL 120232, ¶ 43 ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." (Internal quotation marks omitted.)). Thus, we affirm the court's finding of unfitness.

¶ 35                                         B. Best-Interest Finding

¶ 36 The State must prove that termination is in the child's best interests by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). "The court's best-interest

finding will not be reversed unless it is against the manifest weight of the evidence." *In re Veronica J.*, 371 Ill. App. 3d 822, 831-32 (2007).

¶ 37 At the best-interest hearing, the evidence showed Z.S. had been in her paternal grandmother's care since September 2017, from the age of 17 months. All her needs were being met, as neither Webster-Cantrell Hall nor CASA had any concerns for her well-being. This foster home was an adoptive placement and was described as a safe, loving, stable, and caring home. It was obvious to Beasley-Ricks that Z.S. and her foster mother shared a strong bond and Z.S. was very secure in her placement—a potential adoptive home.

¶ 38 Based on these findings, we conclude the trial court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence. We find no error.

¶ 39                                   III. CONCLUSION

¶ 40 For the foregoing reasons, we affirm the trial court's judgment.

¶ 41 Affirmed.