**NOTICE**
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (4th) 190461-U

NO. 4-19-0461

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
November 7, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.G., a minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 18JA2 |
| v. | ) | |
| Jared G., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, finding the trial court did not err in terminating respondent's parental rights.

¶ 2     On January 3, 2018, the State filed a petition for adjudication of neglect with respect to G.G., the minor child of respondent, Jared G. In June 2018, the trial court adjudicated the minor neglected, making him a ward of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in February 2019. Following a hearing on the State's motion in May 2019, the court found respondent unfit. A best-interests hearing was held on June 14, 2019, where the court found it was in the best interests of the minor to terminate respondent's parental rights.

¶ 3     On appeal, respondent argues the trial court erred in finding it was in G.G.'s best interests to terminate respondent's parental rights as the decision was against the manifest weight

of the evidence. We affirm.

¶ 4                                   I. BACKGROUND

¶ 5            In January 2018, the State filed a petition for adjudication of neglect with respect to G.G., a minor child born January 30, 2017, and a sibling who is not a part of this appeal. Respondent was alleged to be the father of G.G., and the State alleged the minor was neglected due to an injurious environment caused by respondent and the mother by exposing the child to domestic violence. After a temporary shelter-care hearing in March 2018, guardianship and custody of G.G. was temporarily placed with DCFS.

¶ 6                              A. Adjudicatory Hearings.

¶ 7            Over a nonconsecutive three-day period beginning on April 6, 2018, continuing on April 19, and concluding on May 6, 2018, the trial court heard evidence on the State's petition for adjudication. The facts presented at that hearing, as well as at the dispositional hearing in June 2018, are set forth in detail in *In re G.G.*, 2018 IL App (4th) 180410-U and will not be repeated except where relevant to the court's ruling here.

¶ 8            At the conclusion of the adjudicatory hearing, the trial court characterized the evidence thusly: "The evidence that I've heard demonstrates a very dysfunctional relationship between [the mother] and [respondent]. It's one that's characterized by issues of power and control and every incident is generated by a demand that [respondent] is making of [the mother], her resistance, and an attempt to overcome that resistance."

¶ 9            Noting the State's burden of proof at the adjudicatory stage to be by a preponderance of the evidence, the trial court then outlined a series of incidents of domestic violence as well as erratic and aggressive behavior by respondent, most, if not all, of which occurred while in the presence of the children, including G.G. The trial court specifically

- 2 -

commented on the behavior of the mother when being questioned by respondent, who chose to represent himself in these proceedings. As the court described it:

> "As [respondent's] questions came to her in his loud, forceful manner, she backed down and backed down and backed down and her voice got softer and softer and softer until at the end you could barely hear her. That is a person in an abusive relationship reacting to the person who's abusing her, and it was on full display in this courtroom."

¶ 10 The court concluded the State had met its burden, not merely by a preponderance, but beyond that, by clear and convincing evidence. After hearing the court's ruling and while other matters were being addressed, respondent offered to "sign over my rights to my child to make sure they are returned to [the mother]." Instead, the court explained how the case would proceed next to a dispositional hearing, explaining what it was, and how both parents were to cooperate with DCFS and comply with any services or risk possible termination of their parental rights.

¶ 11 At the dispositional hearing in June 2018, the trial court entered a finding of unfitness against both parents, placed custody and guardianship with DCFS, and provided both parents with instructions on how to proceed in order to regain custody through cooperation with DCFS and compliance with their respective service plans. Respondent appealed the trial court's finding, which we affirmed in November 2018.

¶ 12 The trial court entered a permanency order in December 2018, returning guardianship to the mother but concluding respondent failed to make both reasonable and substantial progress and reasonable efforts toward reunification.

¶ 13   B. Termination of Respondent's Parental Rights

- 3 -

¶ 14         In February 2019, the State filed a motion seeking a finding of unfitness and termination of respondent's parental rights. Count I alleged respondent failed to make reasonable progress toward the return of the minor to his care during any nine-month period following the adjudication of neglect or abuse, namely from May 14, 2018, to February 14, 2019. Count II alleged that respondent was unfit pursuant to section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2018)) for failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare.

¶ 15         In May 2019, the trial court heard evidence regarding the State's motion to terminate parental rights. Respondent was, at that time, represented by the public defender. However, he failed to appear at the termination hearing even though he had been arrested the night before and advised of the hearing date and time before bonding out of the correctional center.

¶ 16                              1. *Alyssa Dent*

¶ 17         Alyssa Dent testified she was a foster care supervisor with the Center for Youth and Family Solutions (CYFS), where she served in a supervisory capacity for two years. She was respondent's caseworker from the case opening in March 2018 to mid-August 2018. When respondent was assessed, he was found in need of services for domestic violence, substance abuse, parenting, and mental health, and he was to cooperate with the agency. Although she had spoken to respondent on numerous occasions about the need for services, she testified respondent indicated "he didn't feel he was in need of services, and he made it pretty clear he wouldn't participate in anything that we referred him to." Dent requested signed releases of information from respondent in order to verify his involvement in services; however, he did not provide them until July 2018. During the time she supervised respondent's case, he never provided verification

of attending domestic violence counseling or the parenting or substance abuse classes to which he had been referred.

¶ 18      When asked to describe her contact with respondent throughout the time she was either the worker or supervisor of his case, Dent described it as "infrequent, and he was always very short with me." She also indicated he changed addresses frequently, both within and outside the state. Although visits were available to him once a week, Dent said he attended one visit in each of the months of June, July, and August. The other weeks he either scheduled and did not appear or failed to schedule a visit at all. She acknowledged that of those visits he did attend, his interaction with the minor child was appropriate.

¶ 19      After discontinuing her involvement with respondent's case in mid-August 2018, her next contact with respondent was in January 2019. Respondent said he obtained service providers in Georgia, where he was living; however, he failed to provide verification of attendance or completion of any program there and did not provide signed releases of information in order to allow the caseworkers to verify his representations.

¶ 20      Weekly visitation was resumed in March 2019; however, respondent either arrived late or failed to appear. Dent also testified respondent said he was providing cash assistance to respondent mother. His offers to verify this with "screen shots" of his transactions were never forthcoming.

¶ 21                    2. *Syreeta Butler*

¶ 22      Syreeta Butler testified she had been a foster care caseworker for CYFS for two years and was the caseworker for respondent's case since September 2018. She did not have a good address or telephone number for respondent and was ultimately able to find him through a "diligent search." In each instance she sent correspondence, it was returned "undeliverable."

¶ 23    Butler testified her first contact with respondent was in February 2019. The State's motion seeking termination of respondent's parental rights was also filed in February 2019. During respondent's first contact with Butler, the only thing he wanted to discuss was reinstituting visitation. By that time, he had scheduled no visits since September 2018. Respondent indicated he was still living in Georgia. Although he was told he could begin visits again, he made no effort to do so until March 2019, and he was approximately one hour late for the first one. After that, he either failed to appear or was late for any other scheduled visits.

¶ 24    Butler described one visit in particular that concerned her. Respondent was playing music during the visit which "had a lot of profanity in it." She attempted to speak with respondent about it, as she described it, "I mentioned it, but it was like—it was kind of like going to escalate, so I just let it be. And then he stopped playing it, and then he just started back interacting with [G.G.]" By the time of the termination hearing in May 2019, she estimated respondent attended five or six visits since March 2019, although they were available to him weekly. In addition, after the March visit, respondent indicated he had moved to Gary, Indiana.

¶ 25    Butler said when she attempted to talk to respondent about providing verification of services in April 2019, "he got really offensive and rude on the phone about it, and he told me that he did not have to provide us with any documentation of him completing any services." Butler also testified that at no time during the pendency of the case was she ready to recommend a change in visits from supervised to unsupervised because respondent had completed no services and "was always confrontational whenever we had conversations."

¶ 26                    3. *C.T., Mother of G.G.*

¶ 27    The minor's mother, C.T., was called to testify that she regained custody of G.G. sometime in December of 2018, and since the case's opening, respondent provided her with two

"cash app" transactions of $10 each. Otherwise, he provided no cards, letters, or gifts for the minor and had not inquired about the child's health or well-being.

¶ 28       After asking the trial court to take judicial notice of all orders, petitions, and motions filed in the case, the State rested.

¶ 29                          4. *Todd Lighty*

¶ 30       Todd Lighty, a family support worker for CYFS, was called by respondent to testify about his observations of visits between respondent and G.G. He said he had been present for three to five visits since March 2019 and had monitored some visits the previous year, during the summer months. For the visits since March, respondent was late each time. Lighty believed respondent and G.G. shared a bond and during his observations, he believed respondent's behavior was "caring and appropriate."

¶ 31       Respondent's counsel then renewed his request to continue the hearing due to the failure of respondent to appear since it would have been counsel's intention to call him as a witness. Following arguments, the trial court found the State had proved the elements for each count alleging unfitness of respondent by clear and convincing evidence. The trial court noted respondent "had not accepted responsibility for the problem, which was the unhealthy relationship that he'd developed with [the mother], characterized by dependence, dominance, and verbal and physical abuse, and he had no understanding of the nature of the danger it posed to [G.G.]" The court further noted respondent provided no verification of receiving or successfully completing any of the recommended services contained in his client service plan although he was provided numerous opportunities to do so. He also failed to maintain regular contact with those who were providing care for G.G. and provided no meaningful financial assistance for his child.

¶ 32       The trial court expressly found the State proved by clear and convincing evidence

respondent failed to make reasonable progress under any objective standard during the relevant time frame in count I and failed to maintain a reasonable degree of interest, concern, or responsibility under any subjective standard in count II.

¶ 33                           C. Best-Interests Hearing

¶ 34          The best-interests hearing was held in June 2019, at which respondent again failed to appear and was represented by counsel in his absence. The trial court took judicial notice of the best-interests report and previous permanency report as well as Champaign case No. 18-F-135, a paternity action in which respondent previously failed to appear and in which a default judgment of paternity was entered against respondent as to G.G. on September 19, 2018.

¶ 35          After the arguments of counsel, the court indicated it had considered the materials, representations, and recommendations of counsel, the matters of which judicial notice had been taken, as well as the evidence at the adjudication. Noting the unusual posture of the case since custody had previously been returned to C.T., the mother, and adoption was not the ultimate goal of these termination proceedings, the court found C.T. was a fit, able, and willing parent. The court made it clear it understood the issue was whether it was in G.G.'s best interests to remain with one parent while terminating the parental rights of the other. The court further noted it had considered all the statutory factors applicable to a best-interests finding, whether they were expressly mentioned or not. The court stated the outcome was not to be considered punishment of respondent because "he's a difficult person and because he has really been disruptive here with [DCFS]. It's not about that. It's not about me deciding he's a bad dad and so I ought to terminate his parental rights." The court found by clear and convincing evidence it was in the best interests of G.G. and the public that the parental rights of respondent be terminated. The court then took the time to provide a detailed explanation of how and why it reached its

decision.

¶ 36 Noting the case began with "dangerous domestic violence" between respondent and C.T., it became obvious respondent was "a dangerous part of the home environment for [G.G.]" It was noted, in one instance, respondent picked up the infant and almost jumped out of a first-floor window to avoid the police. However, "[h]e never took responsibility for anything as this case moved forward and never demonstrated a desire to change in any possible way." The court found respondent a "disruptive influence" in the life of the mother and G.G. throughout the pendency of the case. The trial court noted the apparent bond between respondent and G.G. was less a parental bond than one similar to an uncle who shows up occasionally and gets along well with the minor child.

¶ 37 It was also noted how, ironically, respondent fought the establishing of paternity in this case and never cooperated in the process, but he was eventually declared the parent through a separate paternity case and it appeared he did not want to have the legal responsibility for G.G. "What's demonstrated," the court said, "is that [respondent] will just be a disruptive chaotic influence, dangerous to this family and dangerous to [G.G.] if he's allowed to maintain his parental rights and circulate out there, popping into the life of this family once in awhile [*sic*] as he deems it consistent with his mood of the day."

¶ 38 Finding the mother was fit, willing, and able to parent, the trial court proceeded immediately to a permanency review and upon the recommendation of DCFS that guardianship be returned to the mother and wardship terminated, the court vacated wardship at that time.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 Respondent argues the trial court erred in determining it was in the minor's best

interests to terminate his parental rights because the decision was against the manifest weight of the evidence. We disagree.

¶ 42    "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). Even so, "[c]ourts will not lightly terminate parental rights because of the fundamental importance inherent in those rights." *In re Veronica J.*, 371 Ill. App. 3d 822, 831, 867 N.E.2d 1134, 1142 (2007) (citing *In re M.H.*, 196 Ill. 2d 356, 362-63, 751 N.E.2d 1134, 1140 (2001)). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights is in a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of

every family and child; (9) the risks related to substitute care; and

(10) the preferences of the person available to care for the child."

*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123,

141 (2006). See also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 43        A trial court's finding that termination of parental rights is in a child's best

interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In

re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found

to be "against the manifest weight of the evidence only if the opposite conclusion is clearly

apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*,

2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 44        As respondent notes, some evidence, particularly from his unfitness hearing,

established respondent and G.G. had a "father-son bond." Respondent argues the trial court did

not properly consider this bond, which had substantial weight because no adoption was pending,

and, as a result, its decision was against the manifest weight of the evidence. While "[e]vidence

of a bond or lack thereof between parent and child is relevant to the trial court's best-interest

determination," the existence of the bond is only one factor for the court to consider. *In re M.R.*,

393 Ill. App. 3d 609, 615, 912 N.E.2d 337, 343 (2009); see also *Daphnie E.*, 368 Ill. App. 3d at

1072. The record before us reveals the trial court considered several factors, such as G.G.'s

physical safety and welfare, his other relationships, and his need for stability, as well as the other

statutory factors, and based its determination on the best-interests report and evidence from the

fitness hearing, including witness testimony.

¶ 45        The best-interests report indicated G.G. resided with respondent mother and his

sister since December 14, 2018. In this environment, he was eating and sleeping well, had

developed a strong bond with his mother and sister, and appeared to be happy. The report also stated G.G. currently had no health concerns. However, the report reflected G.G. had few positive connections with respondent. As was also noted at the fitness hearing, the best-interests report further noted respondent did not complete services, cooperate with the agency, or maintain any type of consistency regarding visits with G.G. In addition to the facts contained in the best-interests report, the record showed G.G.'s home life with respondent was unstable, respondent was unpredictable and uncooperative, and G.G. had been exposed to domestic violence. Throughout the pendency of the case, respondent made no effort to correct any of the circumstances or behaviors that warranted the finding of neglect in the first place.

¶ 46　　　　As a result, the trial court considered respondent "a dangerous part of the home environment for [G.G.]" and found he "never demonstrated a desire to change in any possible way." Furthermore, the court noted, "what [respondent] demonstrated was that he wanted to pop up when it was convenient for him, have [G.G.] call him dad, then disappear again and never have that relationship formalized so that he would never have a legal responsibility for [G.G.]" This finding is substantiated by the sporadic visitation, failure to attend either the adjudication or best-interests hearings, and moving away from, not closer to, his child. The court further found, based on the evidence presented, respondent played no role in G.G.'s life and failed to demonstrate any degree of interest, concern, or responsibility as to G.G.'s welfare. Considering the evidence and the best interests of the minor, we find the court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 47　　　　　　　　　　　　　III. CONCLUSION

¶ 48　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 49　　　　Affirmed.