NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230975-U

NO. 4-23-0975

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 14, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* N.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Ogle County |
|     Petitioner-Appellee, | ) | No. 22JA2 |
|     v. | ) | |
| Marsha N., | ) | Honorable |
|     Respondent-Appellant). | ) | Anthony Peska, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights.

¶ 2    In July 2023, the State filed an amended petition seeking to terminate the parental rights of respondent, Marsha N. (also known as Marsha S. and Marsha D.) to her minor child, N.S. (born January 2022). Following fitness and best interest hearings, the trial court granted the State's petition and terminated respondent's parental rights. Respondent appealed, and counsel was appointed to represent her. Appellate counsel has now filed a motion for leave to withdraw and a supporting brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), contending he can raise no meritorious issue on appeal. For the reasons that follow, we grant appellate counsel's motion to withdraw and affirm the court's judgment.

¶ 3                         I. BACKGROUND

¶ 4                    A. Shelter Care and Adjudicatory Proceedings

¶ 5        On January 31, 2022, the State filed a petition for adjudication of wardship for N.S., then three days old. A statement of facts from the Illinois Department of Children and Family Services (DCFS) filed along with the petition alleged N.S. was taken into protective custody after hospital staff expressed concern over respondent's ability to physically care for N.S., based on her history of mental illness and cognitive dysfunction. Staff reported respondent was struggling with feeding and feeding cues and was not grasping lessons from nurses. Staff were also concerned about respondent's paramour, Joe S., who threatened hospital staff, brought a "large pocket knife" onto hospital premises, had to be escorted from the hospital by law enforcement, and encouraged respondent to leave the hospital with N.S. against medical advice. The State's petition alleged N.S. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that his environment was injurious to his welfare due to (1) respondent's mental health issues which prevent her from properly parenting, (2) respondent leaving the hospital against medical advice before a psychological evaluation could be completed, ; and (3) Joe threatening a hospital staff member. Also named in the petition were Joe as N.S.'s putative father and respondent's estranged husband, Richard N., as N.S.'s legal father. (During the pendency of the case, respondent finalized her divorce to Richard and married Joe. Neither Joe nor Richard are parties to this appeal.)

¶ 6        The trial court held a shelter care hearing the same day. The court granted temporary custody to the guardianship administrator of DCFS. The court also ordered DNA tests to determine paternity.

¶ 7		At a status hearing on March 15, 2022, based on respondent's cooperation and improvement, DCFS stated it did not have any safety concerns. N.S. was returned to respondent's care.

¶ 8		On April 26, 2022, the trial court held a status hearing. Joe was discharged from the case, as it was determined he was not the father of N.S.

¶ 9		The court appointed special advocate (CASA) filed a motion for a protective order and/or modification of temporary custody order. The motion alleged several concerns CASA had about Joe's continued presence. A lengthy list of concerns included Joe threatening CASA workers if they attempted to go to the residence and stating he was always armed and had a dual personality.

¶ 10		DCFS took protective custody of N.S. on May 10, 2022, after respondent, upon learning of CASA's motion to have Joe removed from the home, handed N.S. to the bailiff and left the courthouse without explanation. Respondent considered signing away her parental rights to N.S. and was hospitalized at least once. The State amended the petition for adjudication of wardship with a count alleging N.S. was left without supervision for an unreasonable period of time (*id.* § 2-3(1)(d)) based on respondent abandoning him at the courthouse.

¶ 11		In August 2022, the trial court adjudicated N.S. neglected based on count I of the petition and made him a ward of the court. Later the same month, the court held the dispositional hearing. Respondent's counsel, Ashley Davis, informed the court she had received correspondence from respondent stating she "no longer wished to have representation." However, respondent then elected to retain Davis as counsel. After the hearing, the court found respondent unfit and unable, for reasons other than financial circumstances alone, to care for the minor. The court also ordered Joe to complete services if he were to take a paternal role.

¶ 12                           B. Termination Proceedings

¶ 13          On July 11, 2023, the State filed an amended petition for termination of parental

rights. The petition alleged respondent was an unfit person as defined in section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2022)) in that respondent (1) is unable to discharge her

parental responsibilities due to a mental impairment, mental illness, or intellectual disability (*id.*

§ 1(D)(p)), (2) failed to protect the child from conditions injurious to the child's welfare (*id.*

§ 1(D)(g)), and (3) failed to make reasonable progress towards the return of the child during any

nine-month period after the adjudication of neglect, namely August 4, 2022, through May 4,

2023 (*id.* § 1(D)(m)(ii)).

¶ 14          At the arraignment on the petition for termination of parental rights, respondent

informed the trial court she "fired" her attorney, Davis. The court initially discharged Davis.

Respondent declined time to hire another attorney or have another attorney appointed and instead

chose to represent herself during termination proceedings. The court then reappointed Davis to

act as standby counsel.

¶ 15                              1. *Fitness Hearing*

¶ 16          The fitness hearing commenced on September 12, 2023. Respondent proceeded

*pro se*.

¶ 17          Dr. Nicholas O'Riordan testified he was the clinical psychologist who completed

respondent's psychiatric evaluation. Dr. O'Riordan was concerned about respondent's

relationship with Joe, as various sources described Joe as "aggressive and irrational."

Respondent believed Joe to be "protective." He noted respondent saw leaving N.S. with the

bailiff as "a good act, it was like leaving the child in a safe place." Dr. O'Riordan completed an

intellectual assessment with respondent and determined her full-scale IQ score was 68, in the

mentally deficient range. In his opinion, respondent would have "great difficulty just taking care of herself and keeping herself safe," and he further opined respondent "would not be able to safely take care of a child, particularly a young child who cannot do anything for themselves." He stated, as for treatment, "[Respondent] can help herself to maintain stability by treatment and medication, but no treatment would change the basic deficits and make her able to safely parent a child." Dr. O'Riordan based his opinion of respondent's mental health issues, her background, and instability in her life, primarily in relationships. The psychiatric evaluation was entered into evidence without objection.

¶ 18    The caseworker, Angie Miller, testified she had been assigned to N.S. since December 2022. Respondent completed the integrated assessment, was recommended for services, and initially agreed to sign consent forms for DCFS to receive information on her progress in services. In January 2023, respondent refused to allow Miller in the home and refused to sign consent forms. Respondent otherwise stayed in contact with Miller, kept her appointments, completed the psychological assessment, and participated in psychological treatment. The service plan indicated respondent needed to increase her understanding and develop a healthy approach to parenting. Miller stated respondent had not demonstrated any improvement. The service plan also indicated respondent needed to increase her ability to control intense emotions and decrease symptoms of anxiety and depression that impact her parenting ability. Respondent had not demonstrated improvement to Miller. She received no documentation from providers on any improvement from respondent. Miller believed respondent participated in all recommended services, but she had not received any documentation of completion and respondent had not demonstrated any ability to apply what she learned in parenting classes to her interactions with N.S. She noted respondent struggled with

"understanding [N.S.'s] needs as he's getting older, and not treating him so much like a baby." Miller also expressed concerns about Joe and stated, in March 2023, Joe "threatened to pull [her] out of the car and beat [her], he was going to come and kill people at DCFS because he's said he's killed people before." Visitation was moved to DCFS offices and Joe was not allowed to participate in visitations. Visitations were reduced from two hours a week to two hours every other week, and eventually to two hours a month. Respondent did not appear to understand the agency's concerns about Joe's involvement with N.S. Respondent was never approved for unsupervised visitation based on her abilities and her unwillingness to separate from Joe.

¶ 19　　　　At the State's request, the trial court took judicial notice of the temporary custody order, the adjudicatory and dispositional orders, and two permanency orders, along with agency reports, CASA reports, and service plans.

¶ 20　　　　Alexis Lowe testified for respondent. Lowe had been respondent's counselor for a year and a half. Respondent attended all appointments and met with a doctor as required. Lowe also agreed, to her knowledge, respondent had taken all of her medication as prescribed.

¶ 21　　　　Respondent testified she had been meeting with Sinnissippi and Health Families to prepare for having a child. She was provided with any information she did not have and could reach out with any questions. Respondent stated she was aware of N.S.'s needs and had no issue taking care of him. She left N.S. at the courthouse believing DCFS was going to remove him from her care and the courthouse was a safe location, but she understood she was wrong. Respondent explained she had been living on her own since she was 23 years old and could take care of herself and her husband. She stated, "if I can take care of my husband, I can take care of my son." Respondent completed all the required services and did everything asked of her. She did not believe her mental illness limited her ability to parent.

¶ 22 The trial court found respondent unfit on all three counts alleged in the State's termination petition.

¶ 23 2. *Best Interest Hearing*

¶ 24 As the trial court commenced the best interest hearing, respondent expressed she didn't "see the point in staying," as the court had already made the decision to terminate her rights. The court clarified it made a finding as to fitness and respondent had a right to remain for the best interest hearing, but she was free to leave if she so chose. Respondent remained for the best interest hearing.

¶ 25 Miller testified N.S. was in a traditional foster home and had spent most of his life in this placement. All of his needs were provided for, and N.S. was attached to his foster family. The foster family consisted of the parents and other foster children, and N.S. had developed a relationship with all of the family members. N.S. was not yet fully verbal, but from Miller's observations, he felt safe and loved in the home. The foster family was willing to offer permanency for N.S. through adoption.

¶ 26 Trisha Patterson, the guardian *ad litem*, testified she had visited N.S. in the foster home. She agreed with Miller's comments on N.S.'s placement and believed it was in N.S.'s best interest to remain in the foster home.

¶ 27 Respondent did not present any evidence, stating, "There's no point."

¶ 28 The trial court found it was in N.S.'s best interest to terminate respondent's parental rights.

¶ 29 Respondent filed a timely notice of appeal, and the trial court appointed counsel to represent her. Appellate counsel subsequently filed a motion to withdraw and a supporting brief in compliance with *Anders*. See *In re J.P.*, 2016 IL App (1st) 161518, ¶ 8 (finding *Anders*

applies when counsel seeks to withdraw from representation on direct appeal from orders affecting parental rights under the Juvenile Court Act). Appellate counsel provided proof of service of his motion and supporting brief on respondent, and this court granted respondent the opportunity to file a response. Respondent has filed a response.

¶ 30                                    II. ANALYSIS

¶ 31        We must first address the delay in the issuance of this order. As a matter addressing the custody of minors, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Here, the notice of appeal was filed on October 11, 2023, making our decision due by March 4, 2023. Although every effort was made to comply with the deadline under Rule 311(a)(5), due to several requests for an extension of time filed by counsel, we find good cause exists for filing this decision beyond the deadline.

¶ 32        On appeal, appellate counsel seeks to withdraw, contending there are no nonfrivolous issues for appeal. In his memorandum supporting the motion, appellate counsel states he has reviewed whether there are any meritorious arguments challenging (1) the trial court's finding of unfitness or (2) the court's best interest finding. Appellate counsel concluded any such argument would be frivolous. We agree.

¶ 33                            A. Unfitness Finding

¶ 34        The Juvenile Court Act sets forth a two-stage process for the involuntary termination of parental rights.

¶ 35        At the first stage, "the focus is on the parent's conduct relative to the ground or grounds of unfitness alleged by the State." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[T]he State

must *** demonstrate by clear and convincing evidence that the parent is 'unfit' under one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2004))." *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007). On review, this court "accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003). "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 36　　　　In this case, the trial court found the State met its burden by clear and convincing evidence as to all three counts alleged against respondent. It found respondent (1) unable to discharge her parental responsibilities due to mental impairment, (2) failed to protect N.S. from conditions injurious to the child's welfare, and (3) failed to make reasonable progress during the period of August 4, 2022, to May 4, 2023. Although the court found the State met its burden as to all counts, "[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005).

¶ 37　　　　Appellate counsel contends he can make no meritorious argument the trial court's finding of parental unfitness on the basis of respondent's failure to make reasonable progress within a nine-month period was against the manifest weight of the evidence.

¶ 38　　　　Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). Reasonable progress exists when the trial court

"can conclude that \*\*\* the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 39 We have emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). A trial court may only consider evidence from the relevant time period in determining a parent's fitness based on reasonable progress. *Reiny S.*, 374 Ill. App. 3d at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38 (2003)).

¶ 40 Here, halfway through the relevant nine-month period, respondent's cooperation with DCFS deteriorated. Respondent stopped allowing the caseworker into her home and stopped providing consent forms. Without these consent forms, DCFS could not verify respondent's progress in or completion of services. Further, after Joe's threats towards the caseworker and DCFS staff, visitation was moved out of the home and restricted, limiting any opportunity to demonstrate meaningful progress.

¶ 41 Respondent argues in her response she completed all of the services asked of her. While reasonable effort can be shown by engaging in services, a parent fails to make reasonable progress if she does not implement the skill taught in those services. See *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004); see also *Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 54-57 (finding a father who "fully complied with the service plan" failed to make reasonable progress because he continued to be involved in domestic violence incidents). "[T]here [is] a significant difference between

going through the motions, checking off the boxes, and mechanically doing what is asked of the parent, and actually changing the circumstances that brought the children into care." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56.

¶ 42　　In this case, respondent's lack of cooperation with consent forms meant her caseworker did not receive documentation she completed services as required. However, even if we assume respondent completed all of the services required in her service plan, as Miller believed she had, respondent failed to demonstrate any ability to implement skills learned from those classes. Miller testified she witnessed visits and observed respondent struggle with understanding N.S.'s needs, which were evolving as he grew up. Further, Miller had no information from service providers showing any growth from respondent's participation in services. Finally, respondent repeatedly failed to understand Joe's ongoing presence as a barrier to N.S.'s return. N.S. came into care not only because of concerns about respondent's abilities, but also because of concerns regarding Joe's untreated violent and impulsive behavior. Respondent's limited growth and the ongoing presence of Joe meant the trial court was no closer to returning N.S. to respondent's care than it was at the outset of the case.

¶ 43　　Based on this record, we agree with appellate counsel no claim of arguable merit can be raised challenging the trial court's finding of unfitness for failure to make reasonable progress. Because we have concluded the court's finding of failure to make reasonable progress toward N.S.'s return is not contrary to the manifest weight of the evidence, we need not consider the alternative bases for the court's finding of unfitness. See *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 2 (stating a single ground of unfitness under section 1(D) is sufficient to support a finding of unfitness).

¶ 44　　　　　　　　　　B. Best Interest Finding

¶ 45        If a parent is determined to be unfit, the trial court next looks to whether termination of the parent's parental rights is in the best interest of his or her child. *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove termination is in the minor's best interest by a preponderance of the evidence. *Id.* at 366. In making this determination, the court must consider the factors found in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 46        A reviewing court will not disturb a trial court's best interest determination unless the court's finding was against the manifest weight of the evidence. *Id.* "A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result." *Id.*

¶ 47        On appeal, counsel contends he can make no nonfrivolous argument the best interest determination was against the manifest weight of the evidence.

¶ 48    At the best interest hearing, Miller testified N.S. was safe and loved in his foster placement. All of N.S.'s needs were being provided for, and the foster family was willing to provide permanency for N.S. through adoption. Respondent refused to participate in the best interest hearing and presented no evidence. As such, we cannot conclude the trial court's finding was against the manifest weight of the evidence because the record does not clearly demonstrate the court should have reached the opposite result. See *id.* We agree with appellate counsel no claim of arguable merit can be raised challenging the court's best interest finding.

¶ 49                            III. CONCLUSION

¶ 50    For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 51    Affirmed.