NOTICE
Decision filed 01/07/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240973-U

NO. 5-24-0973

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* COLT G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Hamilton County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-1 |
| | ) | |
| Sarah W., | ) | Honorable |
| | ) | Melissa A. Morgan, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice McHaney and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence amply supported the circuit court's findings that respondent was unfit and that the minor's best interests required terminating her parental rights. As any contrary argument would be frivolous, we allow appointed counsel to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Sarah W., appeals the circuit court's orders finding her an unfit parent and terminating her parental rights to Colt G. Her appointed appellate counsel concludes that there is no reasonably meritorious issue that could support an appeal. Accordingly, she has filed a motion to withdraw as counsel, along with a supporting memorandum. See *Anders v. California*, 386 U.S. 738 (1967). Counsel has notified respondent of this motion and this court has provided her with ample opportunity to respond. However, she has not done so. After considering the record on

1

appeal and counsel's motion and supporting memorandum, we agree that there is no issue that could support an appeal. Accordingly, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 3                                                    BACKGROUND

¶ 4        On January 18, 2023, the State filed a petition for adjudication of wardship alleging that respondent and Matthew G. had neglected their minor son, Colt G., who had tested positive for amphetamines and methamphetamine at his birth six days earlier. The petition further alleged that respondent had previously been involved with the Department of Children and Family Services (DCFS), during which time she had failed to complete services, resulting in her older children being adopted, and that she had a history of drug abuse including criminal convictions.

¶ 5        Caritas Family Solutions (Caritas) caseworker Samantha Baker reported that respondent had previously surrendered her parental rights to two older children. She had been released from prison in November 2022, had begun using methamphetamine again, and was believed to be homeless.

¶ 6        Respondent had been convicted of six drug offenses, in addition to three forgery offenses, invasion of privacy, and larceny. In December 2022, the court issued a warrant following her failure to appear on a charge of possession of amphetamine. She was arrested on the warrant in February 2023. Additional pending charges included larceny, assault, burglary, and obstruction of justice. Respondent had undergone an integrated assessment but had not been in contact with Baker, who thus could not review the service plan with her.

¶ 7        An agreed order in May 2023 granted DCFS custody and guardianship of Colt G. An October 2023 Caritas report showed that respondent still had not contacted the caseworker, and

2

thus, had not discussed the tasks on her service plan. To the agency's knowledge, respondent had not participated in any services.

¶ 8     On November 28, 2023, the State petitioned to terminate respondent's parental rights. The State alleged that respondent was an unfit parent in that she had failed to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare and had failed to protect him from injurious conditions in his environment.

¶ 9     At a subsequent hearing, Baker testified that Colt G. had never been in respondent's care, as he was taken into protective custody at birth after testing positive for methamphetamine. Baker had spoken with respondent, directing her to complete services, which included substance abuse treatment, mental health treatment, stable housing, cooperation with the agency, parenting classes, a psychiatric evaluation, and domestic violence counseling. To Baker's knowledge, respondent had not begun any of those services. Respondent told her that she intended to participate in services offered by the Department of Corrections (DOC). However, Baker had not seen any paperwork showing such participation. Baker believed that a waiting list existed for participation in prison services. She believed that respondent would be released from prison in 2027, but thought that she might be able to participate in programs while incarcerated that would reduce her sentence.

¶ 10    When the case began, Baker had been in frequent contact with respondent. After respondent was released from jail, however, she lost contact. To Baker's knowledge, respondent did not establish a home after her release. Baker tried to reach respondent by texting a phone number she had. An aunt with whom respondent was staying was also arrested for methamphetamine, so when Baker went to the home, no one was there.

¶ 11    In February 2024, Baker contacted respondent in prison. The latter advised her that she intended to engage in services while incarcerated, by "signing up for everything [she] can possibly

3

take." Baker did not know the status of that participation. Meanwhile, the case had passed legal screening on November 1, 2023, and the next step would be changing the goal to termination. Baker opined that respondent had not made reasonable or substantial progress toward returning the child home and was unable to complete services while incarcerated.

¶ 12    Colt G. was doing well in his foster placement. He was bonded to his foster parents as the only parents he had ever known. The foster parents were excited at the prospect of adopting him. Baker recommended that guardianship remain with DCFS.

¶ 13    Respondent testified that she went to prison on December 21, 2023. She was on a waiting list for services but could not remember them all. Since she last spoke to Baker, she had been engaged in a substance abuse program called Helping Women Recover. She had learned the day before the hearing that she would be able to start a parenting class.

¶ 14    Prior to going to DOC, respondent had nowhere to live and was moving from place to place. She was not employed, but had been actively looking for work. She had no cell phone. She had attempted to call Baker using someone else's phone, but had not received a response. Respondent admitted she had no income to support Colt G. but testified that that was in the past and all she could do was move forward. She wanted to show him that she did not just walk away from him. She wanted to have the opportunity to have her son returned to her after her release from DOC. She loved her son and was doing the best she could to move forward to serve his best interests.

¶ 15    Following the hearing, the court changed the goal to substitute care pending termination of parental rights. The State subsequently amended the petition to include an allegation that respondent was incarcerated as a result of a criminal conviction, had had little to no contact with

4

the minor prior to incarceration, had provided little to no support for him, and would be unable to discharge her parental duties for more than two years as a result of her incarceration.

¶ 16    At a hearing on the amended petition, the caseworker, now known as Samantha Thompson, testified that a service plan requested respondent to obtain mental health and substance abuse treatment, attend parenting classes, and obtain stable housing and a steady income. Thompson had not received any certificates indicating that respondent had completed any of the assigned services.

¶ 17    Respondent had seen the child in February 2023 but had no other contact with him prior to her most recent incarceration. Respondent and the minor had been in the same room together a total of two times since January 2023. Thompson believed that respondent was engaging in services in DOC but had done nothing else. In her opinion, respondent had failed to maintain a reasonable degree of interest and concern or responsibility toward the minor's welfare.

¶ 18    Thompson expected that respondent would not be released from prison for approximately five years. Prior to respondent's incarceration, Thompson last had heard from her in February 2023. Respondent's two visits with Colt G. occurred in February 2023. Once respondent entered prison, she called Thompson twice about the status of the case, her plans, her activities while incarcerated, how Colt G. was doing, and whether she could have photos of him.

¶ 19    The trial court found respondent unfit. It found that she had failed to appear at the adjudicatory and dispositional hearings, which in itself demonstrated a lack of interest, concern, or responsibility for the child's welfare. The court noted that she had generally appeared for court only when she was in custody. The court further found that respondent had had little to no contact with the child for approximately 11 months. Finally, the court found that respondent's anticipated "out date" was in four years, thus exceeding the two-year timeframe prescribed in the statute. In a written order, the court specifically found respondent unfit for failing to maintain a reasonable

degree of interest, concern, or responsibility for the child's welfare and because her incarceration would prevent her from discharging parental responsibilities for more than two years.

¶ 20     At the best-interests hearing, Thompson testified that Colt was placed with Danton G. and Ariel G. The family included four older foster sisters ranging in age from 7 to 15. According to Thompson, Colt was affectionate with everyone in the family but was particularly attached to Ariel. The foster parents were "more than willing" to adopt the child and understood the process necessary to do so. Thompson opined that removing him from that environment would have "significant harmful affects," as he was very bonded to them.

¶ 21     Ariel G. testified that Colt G. was one week old when he was placed with them. He had been with them ever since. He had his own bedroom but sometimes slept in a pack and play in their bedroom next to their bed. He was up to date on his vaccines and medical appointments and had no health issues. He did not have any cognitive delays.

¶ 22     Ariel and Danton were able to provide for him financially. The family attended church, and Colt attended the toddler Sunday school. There are never any complaints about his behavior there. They had taken him on vacation and to local events like Fall Fest. He called her "mom" and Danton "da-da," which was his first word. He spent all day with her as a stay-at-home mother. The older sisters, particularly the almost-16-year-old, helped out as "mini moms," with tasks such as bathing, feeding, and changing diapers.

¶ 23     Ariel planned to send Colt to daycare and intended to investigate whether she could work at that school. She considered returning to work part-time as he gets older. Ariel was very bonded to Colt G., and it would devastate him if he was removed from their family. She believed that family was important but noted that Colt G. did not really know his mother, as he had only seen her three times.

¶ 24    Danton G. testified that if Matthew G. was really Colt's father, then Colt was his second cousin. Despite their household only having one income, Danton had no concerns about providing for Colt. Colt went with him to mow the yard, and he worked in the garden and fed chickens; he hoped he would want to join him deer hunting and fishing when he was older. Danton's home is child-proofed; they have alarms, baby gates, plug covers, deadbolts on outside doors, and other safety devices. If Colt were to be removed from their home, "it would kill [him]," although he tries to hide those emotions from his wife. He believes Colt is in the best place he can possibly be, and that it is good for Ariel to be able to stay home with him until he is older.

¶ 25    The court found that the minor's best interests required terminating respondent's parental rights. Respondent timely appealed.

¶ 26    After the court issued its order, and after respondent's counsel filed her *Anders* motion, this court, in a separate appeal, vacated respondent's nine-year prison sentence and ordered her immediate release.

¶ 27                                    ANALYSIS

¶ 28    Appointed counsel suggests that there is no meritorious issue that could support an appeal. She concludes that the evidence supports the court's findings that respondent was an unfit parent and that Colt G.'s bests interests necessitated terminating her parental rights.

¶ 29    A proceeding to terminate parental rights occurs in two stages. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2020). Each statutory ground is independent so that if the State proves even one, we can affirm the court's finding. *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007).

7

¶ 30　We note that the circuit court found respondent unfit pursuant to section 1(D)(r) of the Adoption Act, which provides that a parent is unfit if

> "[t]he child is in the temporary custody or guardianship of [DCFS], the parent is incarcerated as a result of criminal conviction at the time the petition or motion for termination of parental rights is filed, prior to incarceration the parent had little or no contact with the child or provided little or no support for the child, and the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." 750 ILCS 50/1(D)(r) (West 2022).

¶ 31　The court, after finding the other elements, found that respondent was serving a nine-year prison sentence with an expected release date that would have prevented her from discharging her parental responsibilities for more than two years. However, after the court's order, we vacated respondent's prison sentence and ordered her released. Thus, this is no longer a valid basis to find her unfit. However, the court also found her unfit on the basis that she failed to "maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." *Id.* § 1(D)(b). The evidence amply supports this finding.

¶ 32　To decide whether a parent has demonstrated a reasonable degree of interest, concern, or responsibility for the child's welfare, the court looks at the parent's efforts to visit and maintain contact with the child, his inquiries into the child's welfare, as well as other conduct exhibiting an interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). The court should focus on the parent's efforts rather than their success, examining the parent's conduct in light of the attendant circumstances. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. A parent's

8

completion of service tasks and attendance at court proceedings are indicative of his interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d at 1065.

¶ 33 Thompson testified that respondent had visited with Colt G. only twice in his lifetime. To Thompson's knowledge, she had not provided support for him. Prior to beginning her prison sentence, respondent had not even begun services intended to allow the minor to be returned to her care. She did not attend court hearings except when she was in custody. Under these circumstances, the court could reasonably conclude that respondent had not maintained a reasonable degree of interest, concern, or responsibility for the minor's welfare.

¶ 34 Similarly, the court reasonably found that it was in Colt G.'s bests interests to terminate respondent's parental rights. Once a parent is found unfit, the court moves on to the second stage of termination proceedings, in which the court decides whether it is in the minor's best interests to terminate parental rights. We should not disturb that decision unless it was against the manifest weight of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 35 Here, the minor was placed in a relative's home, where he had remained since he was taken into protective custody upon his birth. Thompson testified that she had no concerns about him while in the care of the foster parents. She noted that Colt G. was very bonded to the entire family.

¶ 36 Ariel G., the foster mother, testified to her love for Colt G., and the particularly close bond they shared. As a stay-at-home mother, she spent every day with him. Her four daughters and stepdaughters had a close bond with Colt G., and often helped care for him as "mini moms." She and her husband were financially capable of caring for him and ensured he had met all developmental milestones.

¶ 37 He had his own bedroom but often slept in the foster parents' room. They took him on vacations, to local events, and to church, which he enjoyed. Ariel and Danton intended to enroll

9

him in daycare so that he could socialize with children his own age, and then enroll him in pre-kindergarten. Only once he was in school would Ariel consider going to work part-time. If he were to be removed from their home, he would be devastated as their family was the only one he had ever known, and he was well-adjusted to that home.

¶ 38    Ariel's husband, Danton G., agreed with all that she testified to and added descriptions of the time he spent with Colt G. Colt worked in the garden with him, and fed the chickens, and Danton considered him his son. Danton looked forward to Colt growing old enough to join him deer hunting and fishing so he could have the same fond memories of doing that with his dad as Danton had of doing those activities with his father and grandfather. He agreed that Colt was integrated into their home, and it would devastate the family if Colt were removed from the home. This evidence supported the court's conclusion that Colt's best interests would be best served by terminating respondent's parental rights, enabling the foster parents to adopt him.

¶ 39                                  CONCLUSION

¶ 40    As this appeal presents no issue of arguable merit, we grant counsel leave to withdraw and affirm the circuit court's judgment.


¶ 41    Motion granted; judgment affirmed.