NOTICE
Decision filed 02/10/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240988-U

NO. 5-24-0988

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARLEY P.-D., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 22-JA-39 |
| v. | ) | |
| | ) | |
| Damon D., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence amply supported the circuit court's findings that respondent was unfit and that the minor's best interests required terminating his parental rights. As any contrary argument would be frivolous, we allow appointed counsel to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Damon D., appeals the trial court's orders finding him unfit and terminating his parental rights to Marley P.-D. His appointed appellate counsel concludes that there is no reasonably meritorious issue that could support an appeal. Accordingly, she has filed a motion to withdraw as counsel, along with a supporting memorandum. See *Anders v. California*, 386 U.S. 738 (1967). Counsel has notified respondent of this motion, and this court has provided him with ample opportunity to respond. However, he has not done so. After considering the record on appeal

1

and counsel's motion and supporting memorandum, we agree that there is no issue that could support an appeal. Accordingly, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4     On July 5, 2022, the State filed a petition for adjudication of wardship alleging that Marley P.-D. was in an environment injurious to her welfare given that her mother's urine tested positive for amphetamines and methamphetamines upon her admission to the hospital to give birth to Marley. A September 28, 2022, agreed order found that Marley was in an injurious environment due to her mother's drug use.

¶ 5     On October 31, 2022, respondent appeared for the dispositional hearing from the county jail. The court granted custody and guardianship to the Department of Children and Family Services (DCFS), finding that Marley's mother, Blossom P., had not engaged in any services, and respondent was lodged in the county jail.

¶ 6     At a January 30, 2023, status hearing, respondent appeared from the Graham Correctional Center (Graham). His counsel questioned why Marley was placed in traditional foster care despite the willingness of respondent's mother, Connie K., to serve as a foster placement. Counsel related that the caseworker had told respondent that it did not matter what he did in prison, as he would have to repeat the services after his release. Thus, respondent had not engaged in services.

¶ 7     The caseworker, Kristina Wilson, denied having told respondent he could not do services while in prison, but she did explain that an expedited petition to terminate parental rights would likely be filed. She did not learn until three months after the case was opened that respondent wanted Marley placed with his mother. Because Marley was frequently ill during that time, she did not consider moving her to Connie K.'s home or even setting up visits with Connie K.

2

¶ 8     The court stated that it was sure that the caseworker had not told respondent not to engage in services while in prison. It further stated that "it is very difficult—it is basically impossible for them to make progress toward the goal of return home, because they are locked up, but a parent can make efforts."

¶ 9     On May 19, 2023, the State filed an expedited petition for termination of parental rights, alleging that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2022)), for being depraved (*id.* § 1(D)(i)), and because he had been prevented from discharging parental responsibilities due to repeated incarcerations (*id.* § 1(D)(s)).

¶ 10    The court's first permanency order found respondent to have made reasonable efforts toward correcting the conditions that brought Marley into care but found that he "cannot and has not made reasonable progress" toward the return-home goal.

¶ 11    On September 19, 2023, the State filed an amended termination petition. The new filing added an allegation that respondent had not made reasonable progress toward the minor's return between September 27, 2022, and June 27, 2023, or between December 19, 2022, and September 19, 2023 (see *id.* § 1(D)(m)(ii)).

¶ 12    The State began the dispositional hearing by introducing documentation of respondent's convictions of retail theft, possession of methamphetamine, theft, and three counts of disorderly conduct. Carrie Smith, of the Marion County sheriff's office, testified that, per department records, respondent had been booked into the jail on September 12, 2022, and released on November 10, 2022, on a charge of calling in a false bomb threat. Respondent was again booked into the jail on November 14, 2022, where he remained until December 9, 2022, when he was transferred to the

Illinois Department of Corrections (IDOC). The records further showed that respondent had been booked into the jail on numerous occasions dating back to 2008.

¶ 13    Wilson testified that, between September 27, 2022, and June 1, 2023 (her last day as caseworker), respondent was incarcerated. Until then, he had been engaged in substance abuse and mental health treatment. Wilson advised him to take parenting classes through the Community Resource Center.

¶ 14    Prior to his incarceration, respondent stayed in close contact with Wilson. He visited with Marley two hours per week and acted appropriately with her. Wilson had no concerns at that time although she later learned that fentanyl was found in respondent's home. After he was incarcerated, the critical decision was made to stop visits, despite his requests for in-person and video visits. During that time, he saw Marley only once, at a May 2023, court hearing.

¶ 15    Wilson prepared the initial service plan on July 1, 2022, before respondent went to jail. He never actually received a copy because the jail did not allow documents to be brought in, but she discussed it with him. The plan required him to complete mental health and substance abuse evaluations and parenting classes, obtain stable housing, and comply with the requirements of drug court.

¶ 16    The second service plan added the requirement of a domestic violence assessment. Had respondent not been incarcerated, drug testing would have been required as well. Wilson rated respondent unsatisfactory on this plan because he was in the county jail and unable to engage in services there.

¶ 17    By the time of the third service plan, dated May 8, 2023, respondent was at Graham. He was rated unsatisfactory because, although he had made reasonable efforts, he had not made reasonable progress. Wilson testified that, for the period between September 27, 2022, and June

4

1, 2023, respondent did not make progress toward Marley returning home because he was incarcerated. Although Wilson knew that, as of April 2023, respondent was engaged in counseling, parenting classes, and substance abuse treatment, and held a part time job, she never sent him a consent to release information about those things. As a result, she had no information to put in a court report.

¶ 18    After respondent went to prison, she spoke with him by phone once. In March 2023, she tried to call him several times but was told each time that jail staff could not locate him. She next spoke to him in April and saw him in court in May. He asked about setting up visits with Marley and requested photos. Wilson updated him on Marley's medical issues.

¶ 19    Once respondent entered the IDOC, Wilson did not receive any communications initiated by him. However, he engaged in services that were available to him in IDOC and provided records through his attorney to show that he had completed parenting classes. He was also engaged in counseling and an anger management program.

¶ 20    Wilson still rated respondent unsatisfactory on that service plan. She explained that engaging in counseling and other programs while incarcerated does not necessarily satisfy the agency, as it was not possible to assess his progress while incarcerated. She further explained that a task will be rated unsatisfactory even when it is not possible for a parent to engage in that service. She rated respondent unsatisfactory on drug testing because he had missed one test. She contacted his probation officer who confirmed that he had otherwise been testing as requested.

¶ 21    Wilson rated respondent unsatisfactory on stable housing because he was in jail. She knew that he had stable housing prior to his incarceration and that it was safe and appropriate, which is why visits originally occurred there. That he still had access to that home and still had a room prepared for Marley did not generate a satisfactory rating, as the agency could not be sure the home

would be available when he was released. Wilson knew the home was owned by respondent's stepfather. However, because the home was not titled in respondent's name, it was considered potentially unavailable when he needed to return to it. Wilson admitted that she had no reason to believe respondent would not be able to reside there but still rated him unsatisfactory.

¶ 22    Wilson rated respondent unsatisfactory on keeping her updated with changes in address, phone number, employment or household composition, because on one occasion, he went to jail and did not tell her that.

¶ 23    Wilson admitted there were no changes between the two most recent service plans, even though her job is to assist in family reunification, which includes tailoring service plans to the individuals. Although respondent's circumstances had changed between the two plans, they did not change to reflect that. Wilson did not attempt to contact respondent's counselor in IDOC to discuss his enrollment in services, nor did she talk to him about where to send consents for the release of information. She explained that she did not know the name of the services he was involved in until she received certificates of completion from his counsel. She also did not speak to anyone at the prison about the size of its counseling programs or the waiting list to get into those services.

¶ 24    Wilson admitted that she did not give respondent her contact information or that of her supervisor. She did not find it concerning that she did not hear from respondent after he was incarcerated, because he had been angry with her when she denied him visits, when she advised him the case was going to legal screening, and when she told him that his mother would not be considered a potential placement for Marley.

¶ 25    When asked whether she considered any family members as placement, she responded only that respondent's mother and sister were the only ones to reach out about having Marley placed

6

with them. Wilson was told by the investigator that no family member was offered as a placement option. The investigator told her that respondent's sister was provided only as a collateral contact, which is a person who can provide additional information, including offering potential placement options. Despite that, Wilson never contacted respondent's sister. There was never a time prior to June 1, 2023, that respondent made reasonable progress toward the return home goal, because he was incarcerated.

¶ 26   Janae Clarry took over the case from Wilson. As the initial fitness hearing was scheduled just one month later and the goal was no longer return home, Clarry had no contact with respondent. When the fitness hearing was continued a few times, she asked for his contact information from his attorney and found him at Crossroads, a work release program. She did not speak to him until December 2023. She introduced herself and they spoke for about five minutes; Respondent did not ask about Marley at all but rather spoke about himself. He told her he was scheduled to be released within four months. He called her in February 2024. He said that his plan was to stay in the Chicago area, where he was earning good money at his job. He did not ask about Marley. She never spoke to him about a service plan because the goal had already changed and, at that point, services were irrelevant.

¶ 27   Clarry did not know if respondent had ever been provided a service plan. To her knowledge, he had been rated unsatisfactory all along and had never been rated satisfactory on any individual task. She must have created a service plan during her tenure as the family caseworker, but she did not know when that occurred and she did not have a copy of it. She was aware from reading the file that there had been a critical decision to disallow visits. To her knowledge, the decision to stop visits had not been changed. Had he asked her about it, he would have had been

given a way to learn whether he could resume visits. She considered it respondent's responsibility to get involved with Marley if he wanted to do so.

¶ 28 Several witnesses from the sheriff's department and Graham described services available in those venues. Lindsay Milliken, a substance abuse counselor at Graham, was respondent's group facilitator. She described the Inside Out Dad program as one that teaches inmates how to better communicate with their children while they are incarcerated and after they are released. Time Out for Men teaches about relationship communication as well as men's health. Respondent completed both programs. He had also completed an anger management program. He was always very engaged in the programs. He discussed his DCFS case with Milliken and frequently spoke about his daughters.

¶ 29 Connie K. testified that she formerly saw Marley for one hour a month beginning in September 2023. She spoke with respondent every day while he was in prison, and he always asked about Marley. He asked about her medical updates, her foster parents, how big she was getting and how she felt, as well as whether his older daughters had fun visiting with her. He asked Connie K. to send him pictures of Marley, which she did. He talked about wanting to take care of his daughter financially, which he did through family while he was incarcerated.

¶ 30 Connie K. and respondent have always been close, although it had occasionally been "rocky" before he went to prison. However, she had seen a change in his attitude since he was incarcerated. He talked about what he had learned in prison classes, such as how to deal with everyday life. She estimated that seventy percent of her phone calls with respondent were about Marley. Given the opportunity, she would take Marley to see him.

¶ 31 Respondent testified that he was no longer in custody but had not seen Marley since before he was incarcerated. Prior to his incarceration, he was in contact with Wilson almost every day,

8

then only spoke to her once after that. Had he had a direct number for her, he would have tried to call. The only people on his approved call list were his mother and the mother of his two other daughters. He called his mom and his daughters daily when they got home from school.

¶ 32 Respondent first applied for programs immediately upon his arrival at Graham. Prior to his incarceration, he visited with Marley once a week for two hours. When he asked about visits later, Wilson told him there would be no visitation. He also asked for video visits, but she told him that DCFS does not do video visits, which he did not understand.

¶ 33 He never received a service plan prior to his incarceration. Despite that, he engaged in drug court, substance abuse treatment and counseling about substance abuse and anger management. He attempted to engage in parenting classes but was unable to do so. He may have received one service plan throughout the life of the case, but he was not sure that he really understood what a service plan entailed. He was never offered visits and eventually stopped asking. It hurt to be denied, so he saw no point in continuing to ask.

¶ 34 Respondent was employed at Suncast Corporation in Batavia, earning $18.25 per hour. He was to start training for a new position with Suncast that would pay $27.50 per hour. He supported his other two children and would support Marley, too, if he knew how. He had never been given foster parent contact information or been advised how to provide Marley with financial support or clothing. He was financially capable of getting an apartment with a room for her.

¶ 35 Respondent frequently spent time with his other daughters. The night before his testimony, they had a barbecue. He saw them every weekend and communicates at other times by Snapchat or FaceTime, using the tablets he bought them. He was sober and passed drug tests regularly while he was still at Crossroads. Had he ever failed one, he would have been sent back to prison. He would drug-test for his parole officer as soon as he is asked. There were also random drug tests at

9

his place of employment. He does not have any other obligations for parole other than to apprise his officer if he leaves Cook County. His parole was due to end in March 2025.

¶ 36 The court found respondent unfit, stating, "with regard to reasonable progress, the case law is clear that it is virtually impossible for an incarcerated parent to make reasonable progress. I question what we are doing here today. He has been incarcerated *** for 90 percent of the time, certainly the vast majority of time that this little girl has been alive, and could not make progress toward the goal of return home." The court next found that "since he's been incarcerated and repeatedly incarcerated as a result of criminal convictions, he has not been able to be a parent" and was "unable to do those things but that has been his doing, not Marley's." Finally, the court found respondent unfit for being depraved, commenting, "And he doesn't understand what it means to be a parent. I can't find that he's rebutted the presumption of depravity."

¶ 37 The court conducted a best-interests hearing which proceeded on several dates over a period of months. Kelley Banal, the foster mother, testified that she lived with her husband and another foster child. Her husband was a retired major at the IDOC. Kelley had also retired from the IDOC and, at the time of her testimony, worked as a preschool teacher. Her education, experience, and training helped her identify Marley's needs and what programs are available to assist in her development.

¶ 38 Marley had been placed with her at seven days of age and would soon turn two years old. Marley had difficulty focusing; she had some separation anxiety and did not like to be away from Banal. It took her a long time to warm up to people she did not know.

¶ 39 Banal described Marley as thriving after being in therapies to correct her early developmental deficiencies. Marley's health was improving in that she was having less frequent ear infections and respiratory infections than she had as a small baby. Banal's family was

committed to meeting her medical and developmental needs as she grows. The Banals were able to financially support Marley. They loved her very much and she was integrated into the entire extended family, which includes Banal's three adult children and her husband's four adult children, whom Marley referred to as "bubbies" and "sissies." She loved the other family members and loved playing with the animals at Banal's daughter's house.

¶ 40    Should the court terminate respondent's parental rights, they would love to adopt her, as she was a big part of their family, and they are the only family she had ever known. Banal believed that it was in Marley's best interests to be adopted to give her a sense of safety and security. She believed that Marley wanted to stay with them permanently.

¶ 41    Clarry testified that she had observed Marley in the foster parents' home and believed her to be bonded to both parents. She had seen Marley cling to her foster father's neck and hug and kiss him and heard her tell both foster parents that she loved them. It was obvious to Clarry that the foster parents could not imagine life without Marley and showed her love daily. The foster home had three bedrooms and three and a half baths; Marley had her own room. It was an appropriate residence for a child Marley's age. The foster parents had taken Marley to every medical appointment and had advocated for her so that she had received everything she needed; Clarry had no concerns about Marley's placement. In Clarry's opinion, it would be traumatic to remove Marley from the Banals' home.

¶ 42    DCFS investigator Tera Romines testified that she did not place Marley with respondent at the beginning of the case based on his involvement in drug court and some prior "indicated" reports. She denied that respondent offered any information about relatives who could serve as placements and that respondent's sister was only named as a collateral contact. Romines did not recall whether she contacted the sister at all. If she had done so, it would have been documented

11

in the case file. The court did not allow respondent to present evidence about the biological relatives whom Marley would never know as not relevant to her best interests.

¶ 43 Tiffany Roberts testified that respondent is the father of her two daughters, Tailyn and Lainey, although he is not Tailyn's biological father. Roberts said that, when she became pregnant with Tailyn, her biological father did not want anything to do with her. Respondent immediately stepped up to be a father to her. He has always treated both girls as if they were both his biological children.

¶ 44 Roberts had taken her daughters to visit with Marley two or three times; Marley warmed up to her easily and clearly recognized her sisters when she saw them. Roberts' daughters had probably visited Marley 10 or more times. They always asked when they could see Marley again. Roberts had space for Marley in her home if it were needed.

¶ 45 Roberts wanted to have a relationship with Marley as well. In fact, she had been trying to do so for quite some time, frequently contacting DCFS to ask if her daughters could have visits. Connie K. was allowed to take the girls to see Marley in Vandalia.

¶ 46 Roberts admitted that she had obtained an order of protection against respondent in 2021. She explained that she got the order because respondent had been unhappy about her new paramour's possible interference with parenting their daughters. The girls were never included in the order, as Roberts never felt that they were in danger.

¶ 47 Respondent was currently helping parent their daughters. He provided financial support for the girls. He spoke to the girls every day and frequently did so even when he was in prison. Both girls were very attached to him. She had absolutely no concerns about him being around them. Roberts specifically mentioned a three-day weekend just before respondent went to prison. He spent the weekend with the girls, watching movies, going bowling, and eating snacks.

12

¶ 48 Respondent testified that he had not had any visits with Marley since before his incarceration as "nobody wants to do it." He could not get a return phone call from DCFS. He believed his mother was told by a caseworker that they had the last visit they would ever get with Marley, as his rights had been terminated.

¶ 49 Respondent was still employed with Suncast, earning $22.50 per hour. He provided financially for his two older girls. He rented a home but was looking for one to purchase, for which he had been saving money. When asked if he intended to stay in the Chicago area, he answered that it did not really matter where he lived, as he would provide for Marley regardless of where anyone lived. If Marley were returned to him and it was found to be in her best interests to remain in southern Illinois, he would be willing to move back there.

¶ 50 He ensured that he stays out of trouble by "keeping his head down," working steadily, and spending time with his daughter. He did not really talk to anyone outside of his daughters and the rest of his family. His daughters spent time with him in Chicago over the summer and they had a good time. Lainey even brought her best friend with her.

¶ 51 Respondent said that he had resolved his issues with Tiffany's partner, Damian. He recognized that Damian took care of his girls when he could not and now he did the same for Damian's daughter. He had accepted Damian's daughter into his family and treated her just like his own; she was his daughters' sister in his eyes.

¶ 52 Respondent had two sisters and their families, plus his mother and stepfather, in the Salem area. He considered Roberts and her family part of his family. He loved Marley and wished he had been given the chance to know her more than he does. He has no doubt that he could provide her with the security she needs, as well as a stable home, and very much wanted Marley to be a part of his family with his other two daughters. He was financially capable of providing for her.

13

¶ 53 The trial court found it was in Marley's best interests to terminate respondent's parental rights. The court called respondent selfish because he failed to see that asking the court to take this child from her foster parents would be devastating. Respondent timely appeals.

¶ 54 ANALYSIS

¶ 55 Appellate counsel concludes that there is no reasonably meritorious argument that would support an appeal. Counsel suggests that a good-faith argument could be made that both the caseworkers and the trial judge were dismissive of respondent's efforts to be reunited with his daughter. Counsel concludes, however, that such an argument, even if successful, would not provide respondent with any relief because the evidence is clear that, through his own choices, he was incarcerated for the vast majority of Marley's life. Thus, the trial court properly found him unfit on that basis alone.

¶ 56 A proceeding to terminate parental rights occurs in two stages. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2020). Each statutory ground is independent so that if the State proves even one, we can affirm the court's finding. *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007).

¶ 57 The court found that respondent failed to make reasonable progress toward the return home goal during either of two nine-month periods specified. Reasonable progress is an objective test based upon the amount of progress made as compared to the conditions existing at the time of removal. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). Reasonable progress exists when the court finds that it will be able to return the child to the parent's custody in the near future. *Id.*

At a minimum, however, reasonable progress requires measurable or demonstrable movement toward the goal of reunification. *Id.*

¶ 58 Here, as counsel points out, the original decision to take protective custody of Marley was not the result of any conduct by respondent. Initially, moreover, respondent did rather well, participating in drug court and visiting the minor regularly. However, within two months of Marley's birth, he was jailed, and he remained either in the county jail or the IDOC for the vast majority of her life. While there was evidence that he participated in some programs while at Graham, the availability of services in prison was necessarily limited. Respondent was rated unsatisfactory on all tasks for the service plans admitted into evidence. Wilson opined that he never made substantial progress toward the return-home goal.

¶ 59 As noted, arguments could be made that the caseworkers could have provided more support, that some of the service-plan ratings were unfair, and that the limited availability of services in prison was not respondent's "fault." However, the standard for reasonable progress is objective and the fact remains that, due to his incarceration throughout much of the case, the court's finding that respondent failed to make reasonable progress was supported by the evidence. Evidence of progress that respondent made after his release—finding a good-paying job and stable housing—was a case of "too little, too late" coming as it did after the second nine-month period had expired.

¶ 60 Given that the State need only prove one ground of unfitness (*Veronica J.*, 371 Ill. App. 3d at 828), we can affirm the court's finding of parental unfitness without considering the additional grounds. We note briefly, however, that the evidence supported the court's findings on those grounds as well.

15

¶ 61    The court found that respondent was depraved. The Adoption Act (Act) creates a rebuttable presumption of depravity where the parent has at least three felony convictions, at least one of which occurred within five years of the filing of the termination petition. 750 ILCS 50/1(D)(i) (West 2022). The State established the presumption here with proof of respondent's seven felony convictions, several of which occurred during the pendency of this case.

¶ 62    Because the presumption is rebuttable, a parent is still able to present evidence showing that, despite his convictions, he is not depraved. *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 24. Respondent presented some evidence in an attempt to rebut the presumption, showing that he had complied with his limited parole requirements, passed drug tests, and obtained employment. However, given the relatively short time since his release, we cannot say that the court erred in failing to find that he rebutted the presumption.

¶ 63    Similarly, the evidence showed that respondent was unfit due to repeated incarceration. The Act provides that a parent may be found unfit if

> "[t]he child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2022).

¶ 64    There is no dispute that the State established the first three conditions. Marley was in DCFS custody. Respondent was incarcerated when the initial and amended termination petitions were filed, and he had been repeatedly incarcerated as a result of criminal convictions. Moreover, the

16

court reasonably found that respondent's incarceration prevented him, as a practical matter, from discharging his parental duties.

¶ 65    In *In re M.M.J.*, 313 Ill. App. 3d 352 (2000), the court observed that "[b]eing a parent involves more than attending a few visits and sending an occasional gift to the child. The child needs a positive, caring role model present in her life. This ground for unfitness may be utilized regardless of respondent father's efforts, compliance with DCFS tasks and satisfactory attainment of goals, or the amount of interest he has shown in his daughter's welfare." *Id.* at 355. So too here.

¶ 66    Counsel raises two additional potential issues concerning the court's written termination order but concludes that they, too, do not provide a basis for reversal. The court's written order terminating respondent's parental rights refers to a prior finding that "On April 15, 2024, Father, Jason Hrabak, was found unfit pursuant to 750 ILCS 50/1(D)(b), 750 ILCS 50/1(D)(m)(i), and 50/1(D)(m)(ii)."

¶ 67    The first issue is the inclusion of the name "Jason Hrabak." Counsel concludes that this is clearly a scrivener's error, as there is no mention of a "Jason Hrabak" in the record.

¶ 68    The second issue is the clear conflict between the court's oral pronouncement and its written order. The court did not issue a written ruling at the conclusion of the fitness portion of the hearing on the State's termination petition. The only information regarding the trial court's findings to be found near the time of the conclusion of the fitness hearing is that found in the court's oral pronouncement, which very clearly laid out the court's findings. As noted above, the court's oral pronouncement found respondent unfit because he had failed to make reasonable progress toward returning Marley home (750 ILCS 50/1(D)(m)(ii) (West 2022)), was depraved (*id.* § 1(D)(i)), and had been unable to discharge his parental responsibilities because of his repeated incarcerations (*id.* § 1(D)(s)). However, the written order terminating respondent's rights

17

indicated that he was unfit based on sections 1(D)(b), (m)(i), and (m)(ii). He had not been alleged unfit under section 1(D)(m)(i) in either the original or amended petition, and the court's oral pronouncement contained no finding regarding section 1(D)(b). Where, as here, the oral pronouncement of the court and the written order are in conflict, the oral pronouncement controls. *In re William H.*, 407 Ill. App. 3d 858, 866 (2011). Moreover, we believe this to be a continuation of the same scrivener's error that included the name "Jason Hrabak." Finally, we note that the decretal portion of the order specifically terminates the parental rights of "Damon D[.]" We agree with appointed counsel that these discrepancies would not warrant reversal of the trial court's judgment.

¶ 69    Although appellate counsel does not specifically raise the issue, we note that the evidence supports the court's finding that Marley's best interests required terminating respondent's parental rights. Once the parent has been found unfit, his or her rights must yield to the child's best interests. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The State has the burden of proving, by a preponderance of the evidence, that termination of parental rights is in the child's best interests. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004). The court's best-interests findings will not be disturbed unless against the manifest weight of the evidence. *Id.*

¶ 70    Here, the evidence showed that Marley was bonded with her foster family, which was able to provide for her needs, including her medical conditions. She had been placed with the family only days after her birth. By contrast, respondent's evidence of his ability to parent Marley was largely hypothetical. As noted, at the time of the hearing, he had been released from prison for only a short while. His taking custody of Marley would have required either that she be uprooted and move to the Chicago area or for respondent to quit his job and return to Salem. Respondent was renting a house but had plans to purchase one later. Thus, the court's finding that terminating

18

respondent's parental rights was in Marley's best interests was not against the manifest weight of the evidence.

¶ 71        CONCLUSION

¶ 72 As this appeal presents no issue of arguable merit, we grant counsel leave to withdraw and affirm the circuit court's judgment.


¶ 73 Motion granted; judgment affirmed.