NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241570-U

NO. 4-24-1570

IN THE APPELLATE COURT

FILED
April 23, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* J.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McDonough County |
|     Petitioner-Appellee, | ) | No. 22JA19 |
|     v. | ) | |
| Lauren C., | ) | Honorable |
|     Respondent-Appellant). | ) | Heidi A. Benson, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not err in finding termination of respondent's parental rights was
in the minor's best interest.

¶ 2     In April 2024, the State filed a petition to terminate the parental rights of

respondent, Lauren C., to her minor child, J.P. (born April 2019). Following the fitness and best

interest hearings, the trial court granted the State's petition and terminated respondent's parental

rights. Christopher P., the minor's father, signed a final and irrevocable surrender of his parental

rights and is not a party to this appeal. On appeal, respondent argues the court erred when it found

termination of her parental rights was in J.P.'s best interest. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     On October 7, 2022, the State filed a petition for adjudication of wardship, alleging

J.P. was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile

Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged respondent "tested positive for amphetamines, benzodiazepines, and methamphetamines, indicating an ongoing substance abuse issue which has not been adequately addressed, despite [respondent] having previously received services related to substance abuse in McDonough County Case No. 20-JA-06." At the shelter care hearing, the trial court admonished respondent on the State's petition. After receiving these admonishments, respondent waived her right to a hearing. The court accepted respondent's waiver, found there was probable cause for the State's petition, and granted temporary custody and guardianship of J.P. to the Illinois Department of Children and Family Services (DCFS).

¶ 5        The trial court held an adjudicatory hearing over two days in February and March 2023. After hearing evidence and argument, the court found the State met its burden of proving by a preponderance of the evidence J.P. was a neglected minor as alleged in the petition. On April 13, 2023, after argument by the parties, the court entered a dispositional order, finding respondent was "unfit to care for, protect, train, educate, supervise, or discipline [J.P.] and placement with her is contrary to the health, safety and best interest of [J.P.] because: ongoing substance abuse issues which have not been adequately addressed." The court ordered custody and guardianship of J.P. would remain with DCFS.

¶ 6        On April 11, 2024, the State filed a petition to terminate respondent's and Christopher P.'s parental rights. Paragraph 8 of the petition, which related to respondent, alleged:

> "That the respondent mother is an unfit person pursuant to 750 ILCS 50/1D for the
> following reasons:
>
>> (m)(ii) she has failed to make reasonable progress towards the return home
>> of the child during any nine-month period following the adjudication of
>> neglected or abused minor under Section 2-3 of the Juvenile Court Act***.

The People elect to prove-up failure to make reasonable progress between June 1, 2023 and March 1, 2024."

See 750 ILCS 50/1(D)(m)(ii) (West 2022). The trial court set the case for a hearing on the State's petition. The fitness hearing occurred on October 22, 2024, and the best interest hearing occurred on November 14, 2024. Because respondent's arguments relate solely to the court's best interest finding, we discuss only those facts necessary to understand respondent's contentions on appeal.

¶ 7                                    A. Fitness Hearing

¶ 8         At the fitness hearing, the State presented testimony from Amy Strubhar, the Lutheran Social Services of Illinois caseworker assigned to J.P.'s case during the nine-month period alleged in the State's petition. Respondent's counsel presented testimony from respondent. After hearing testimony and arguments, the trial court found the State proved by clear and convincing evidence respondent was an unfit parent as alleged in the petition to terminate parental rights. The court then continued the matter for a best interest hearing.

¶ 9                                 B. Best Interest Hearing

¶ 10                             1. *Testimony of Amy Strubhar*

¶ 11        Strubhar testified respondent was previously involved with DCFS in March 2020, when respondent and Christopher P. brought J.P. to the hospital because J.P. was unresponsive. At the hospital, J.P. "was given four units of Narcan" before hospital staff determined he needed a higher level of care and would be life-flighted to another hospital. During the life-flight, "[J.P.] was given one unit of Narcan every five to ten minutes to help with his responsiveness."

¶ 12        In October 2022, J.P. came back into DCFS custody and was placed with his maternal grandmother, Beth J. However, in February 2023, J.P. began living with his paternal aunt and uncle, Amanda P. and Joe P. Strubhar visited J.P. at his current foster home and had no safety

concerns. J.P. was "very bonded to the foster family" and referred to Amanda and Joe as "mom and dad." Amanda and Joe had four other children, and J.P. considered them his siblings. J.P. told Strubhar he felt "safe and secure" with Amanda and Joe. Amanda and Joe told Strubhar they were willing to adopt J.P. Strubhar believed it was in J.P.'s best interest for them to adopt him.

¶ 13 Throughout the pendency of this case, respondent never progressed past supervised visitation with J.P. When asked about J.P.'s interactions with respondent during the supervised visits, Strubhar noted J.P. "prefer[red] to interact with [respondent] if she brought him a gift or a toy and would want to open the toy that she brought or eat the candy that she brought." Strubhar testified she still had concerns about respondent's ability to parent J.P. because of respondent's continued substance abuse issues.

¶ 14 On cross-examination by respondent's counsel, Strubhar explained J.P. moved from Beth's home to his current foster home because Beth wanted to be a grandmother to J.P. rather than a caretaker. Additionally, Beth told Strubhar she felt she was enabling respondent through her role as a foster placement. Beth approached Amanda about fostering J.P. and did not involve Strubhar or respondent in that discussion. Although respondent was not involved in the discussion between Beth and Amanda, Strubhar informed respondent prior to J.P. moving in with Amanda and Joe. Respondent told Strubhar she wanted J.P. placed with her family. When asked what J.P. calls respondent, Strubhar explained J.P. still called respondent mom, even though he referred to Amanda and Joe as mom and dad. Strubhar acknowledged respondent had maintained stable housing and employment throughout the pendency of the case. However, Strubhar had not visited respondent's home. Respondent did inquire about how J.P.'s doctor's appointments were going but had not requested to attend any appointments since J.P. was placed with Amanda and Joe. Strubhar had attended several visits between respondent and J.P., which lasted an hour and

occurred at the public library. Back in 2020, after J.P. initially came into DCFS's custody, respondent and Christopher P. signed over temporary guardianship of J.P. to Beth. Because temporary guardianship was given to Beth, DCFS ended their involvement without any determination as to whether respondent or Christopher P. were responsible for J.P.'s unresponsiveness.

¶ 15    On cross-examination by the guardian *ad litem* (GAL), Strubhar agreed that "Narcan is administered to someone that appears to be having an adverse reaction to a drug induced situation." Strubhar reiterated that J.P. received 12 doses of Narcan while unresponsive—4 while at the hospital and 8 while on the life-flight. J.P. was 11 months old at the time. Based on her observations as the caseworker since October 2022, Strubhar did not believe respondent had gotten control over her substance abuse issues.

¶ 16    2. *Testimony of Amanda P.*

¶ 17    Amanda P. and her husband Joe were J.P.'s current foster placement. J.P. had lived with them for "just over 21 months." Joe was Christopher P.'s brother. She and Joe had four biological children. DCFS had never been involved in her life. Joe was a school principal, and she was a stay-at-home mother. She and Joe were deacons at their church, but that role did not get in the way of their parenting. Amanda believed J.P. fit in well with her family and had "grown so much" since being placed in their home. J.P. referred "to his foster siblings as brothers and sisters." According to Amanda, "[J.P. felt] loved at school, at church, and in our family." All J.P.'s needs, including "food, shelter, health, and clothing" were being met by Joe and Amanda. J.P. was currently in kindergarten and involved in multiple extracurricular activities, including soccer, basketball, and wrestling. Amanda and Joe were willing to adopt J.P., and Amanda believed it was in J.P.'s best interest to stay with them.

¶ 18 On cross-examination by respondent's counsel, Amanda acknowledged she did not inquire about respondent's or Christopher P.'s religious preferences for J.P. However, when she informed respondent J.P. was attending church with her family, respondent said "that was really great, that she wanted him to be a part of learning about God." Prior to living with her family, J.P. was attending preschool and daycare. When asked whether J.P. had nightmares, Amanda stated J.P. woke up in the middle of the night sometimes, but "he [did not] wake up screaming or sad." Amanda took J.P. to all his medical appointments. She acknowledged J.P. was previously attending counseling but stated it was discontinued because J.P. no longer had any concerning behavioral issues. Although counseling was discontinued, Amanda was not opposed to counseling in the future if the need arose. Amanda and Joe maintained a relationship with J.P.'s extended family on respondent's side, and J.P. visited with his maternal grandparents frequently. Amanda acknowledged respondent attended all her scheduled visitations and that visits were decreased when the goal was changed to termination of parental rights. She denied seeing any issues with J.P. after the decrease in visitation.

¶ 19 On cross-examination by the GAL, Amanda agreed J.P. had never had "an unexplained medical emergency that required hospitalization or intensive care" after being placed in her care.

¶ 20 Following Amanda's testimony, the State requested the trial court take judicial notice of case No. 20-JA-06, which "is the case that *** Ms. Strubhar testified to regarding [J.P.] being taken to the hospital and having to be Life Flighted to a level one trauma center." After the court took judicial notice of that file, the State rested. Respondent's counsel then called Beth J. as a witness.

¶ 21 3. *Testimony of Beth J.*

- 6 -

¶ 22    Beth J., respondent's mother, was J.P.'s foster placement from October 2022 to February 2023. She also previously fostered J.P. from when he was taken into DCFS custody in March 2020 until he was returned to respondent and Christopher P.'s custody. J.P. moved from Beth's home to Amanda's home because Beth felt a family situation would be better for him. Additionally, Beth wanted to return to her role as a grandmother, rather than be a foster parent. Beth originally wanted J.P. placed with his maternal aunt and uncle but was told it was not a viable option because they lived in Iowa. After being told J.P.'s maternal aunt and uncle were not a viable placement option, Beth reached out to Amanda and inquired whether Amanda and Joe would be willing to foster J.P.

¶ 23    While Beth was J.P.'s foster placement, respondent visited on a frequent basis. According to Beth, respondent would come over to visit J.P. "most days unless she had work or was ill." Because respondent was not allowed unsupervised visitation, Beth or her husband would supervise respondent's visits with J.P. During the visits, which usually occurred in the evening, respondent would play with J.P., bathe him, and get him ready for bed. Respondent was also able to appropriately discipline J.P. when necessary. Beth testified respondent and J.P. were very close and "had a very fun and good relationship."

¶ 24    J.P. frequently visited his maternal aunts, uncles, and cousins when he was living with Beth. However, since moving to Amanda and Joe's, J.P.'s visits with those family members had become less frequent. Despite this, Beth believed J.P. understood "he's part of [her] family."

¶ 25    According to Beth, J.P. had asked her on multiple occasions when he was coming home and "home *** to him is with mama." Beth did not believe it would be in J.P.'s best interest to terminate respondent's parental rights because respondent and J.P. had a close bond.

¶ 26    On cross-examination by the State, Beth agreed that Amanda and Joe had continued

to allow her to foster a relationship with J.P. Beth also acknowledged it would not be in J.P.'s best interest to return to respondent's care "unless [Beth] or some other person was there helping [respondent]."

¶ 27       On cross-examination by the GAL, Beth testified the family concluded J.P. ingested drugs when he became unresponsive in March 2020.

¶ 28                                    4. *Testimony of Respondent*

¶ 29       Respondent testified she and J.P. "were very, very close" and she was a very involved parent prior to DCFS taking custody of J.P. She attended all medical appointments and had him registered for preschool. When J.P. had his tonsils removed, she was the first person J.P. wanted when he woke up from anesthesia. Respondent loved J.P. and knew he loved her, too. She did not believe it would be in J.P.'s best interest for her rights to be terminated and thought it "would emotionally be very hard on him later on in life."

¶ 30                                    5. *Trial Court's Ruling*

¶ 31       Following arguments from the parties, the trial court found the State met its burden of proving by a preponderance of the evidence it was in J.P.'s best interest that respondent's parental rights be terminated. The court highlighted the lack of safety in respondent's home, as evidenced by the incident in 2020 when J.P. almost died due to an accidental ingestion of drugs. It then noted Amanda and Joe had continued to allow J.P. to have meaningful contact with respondent's side of the family and planned to "include his mother on terms and conditions that ensure [J.P.]'s safety." Lastly, the court acknowledged the bond between J.P. and respondent but emphasized that J.P. needed permanency and "DCFS [had] to get out of his life." The court then entered a written order terminating respondent's parental rights.

¶ 32       This appeal followed.

II. ANALYSIS

¶ 34        On appeal, respondent argues the trial court erred in finding the termination of her

parental rights was in J.P.'s best interest.

¶ 35        Under the Juvenile Court Act, there is a two-stage process for the involuntary

termination of parental rights. 705 ILCS 405/2-29(2) (West 2022). The first stage, commonly

referred to as a fitness hearing, "focus[es] *** on the parent's conduct relative to the ground or

grounds of unfitness alleged by the State." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The burden is

on the State to "demonstrate by clear and convincing evidence that the parent is 'unfit' under one

or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West

2004))." *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007).

¶ 36        Following a trial court's determination a parent is unfit, "the court then determines

whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d

at 352. At this second stage, commonly referred to as the best interest hearing, "the State bears the

burden of proving by a preponderance of the evidence that termination of parental rights is in the

child's best interest." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. When determining if the State

has met its burden, the court should consider the following statutory factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's
>
> identity; (3) the child's familial, cultural[,] and religious background and ties;
>
> (4) the child's sense of attachments, including love, security, familiarity, continuity
>
> of affection, and the least[-]disruptive placement alternative; (5) the child's wishes
>
> and long-term goals; (6) the child's community ties; (7) the child's need for
>
> permanence, including the need for stability and continuity of relationships with
>
> parent figures and siblings; (8) the uniqueness of every family and child; (9) the

risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

On review, this court "affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility." *J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 37        Initially, we note the State contends "[a]ny argument by respondent *** that J.P. should have been placed with her sister or that her sister should have been considered as an option obviously has no merit and should fail." However, respondent did not raise this issue on appeal and failed to respond to this assertion. Therefore, we construe respondent's silence on the issue as a concession and will not address the State's argument on this point further.

¶ 38        In this case, the trial court's determination it was in J.P.'s best interest for respondent's parental rights to be terminated was not against the manifest weight of the evidence. It was clear from the evidence that although respondent loves and cares for J.P., she is still dealing with substance abuse issues which prevent her from providing a safe and secure environment for J.P. Multiple witnesses testified J.P. originally came into DCFS custody when he became unresponsive while in respondent's care in 2020. Based on respondent's continued struggles with substance abuse, both Strubhar and Beth testified it was not in J.P.'s best interest for respondent to have custody returned to her. Conversely, J.P. had a safe and secure home with Amanda and

Joe, and they were willing to adopt J.P. Amanda and Joe met all of J.P.'s needs, including food, clothing, shelter, and medical care. Moreover, J.P. was bonded with the family, called Amanda and Joe "mom and dad," and referred to their biological children as his siblings. Amanda testified J.P. had "grown so much" since being placed in their home. Additionally, Amanda and Joe continued to allow J.P. to have a meaningful relationship with respondent's family and would continue to allow respondent to have a relationship with J.P., as long as it was safe to do so. For those reasons, the court did not err when determining it was in J.P.'s best interest for respondent's parental rights to be terminated.

¶ 39                                    III. CONCLUSION

¶ 40            For the reasons stated, we affirm the trial court's judgment.

¶ 41            Affirmed.